STATE *v.* REED OIL CO.

(*Nashville*, December Term, 1925.)

Opinion filed July 10, 1926.

Designated for Publication March 2, 1940.

FRANK M. THOMPSON, Attorney-General, and CHARLES C. TRABUE, SR., and WILLIAM L. GRANBERY, both of Nashville, for complainant.

CRABTREE & CRABTREE, of Memphis, for defendant.

MR. JUSTICE COOK delivered the opinion of the Court.

This appeal involves the validity of Chapter 33, Pub. Acts of 1917, and related Statutes levying inspection fees on coal oil and gasoline, and Chapter 54, Pub. Acts of 1925, imposing a privilege tax on petroleum products on which the inspection fees are not paid. A proviso of the Act excludes from taxation products on which inspection fees have been paid. The privilege tax imposed by the latter Act is slightly higher than the fees paid under the former Acts.

The Reed Oil Company was engaged in the sale of petroleum in Tennessee and from July 1, 1924, to December 31, 1925, refused to pay any inspection fees. From April 11, 1925, to December 31, 1925, it refused to pay the privilege tax. It insisted that the inspection fees are so excessive as to render the Statutes providing for the inspection of such products void, and that the Act imposing the privilege tax makes an arbitrary classification which renders it void.

The Chancellor sustained both Acts and upon the admission of Reed Oil Company that if the State was entitled to recover inspection fees the recovery should be $16,704.90, he gave a decree for that sum with interest. The inspection fees allowed by the Chancellor covered the entire period for which the State could claim a privilege tax and no recovery was allowed under the latter Act because the Company could not be held for both inspection fees and the privilege tax.

It is said by the Company that the Statutes providing for the inspection of petroleum products in this State and the payment of the charge provided in Section 2, Chapter 33, Pub. Acts of 1917, produces fees so greatly in excess of the cost of the inspection as to render the Act void, and that it is void because it constitutes a burden on interstate commerce. It is insisted that Chapter 54, Pub. Acts of 1925, is void because of its arbitrary classification contrary to Article 1, Sec. 8, and Article 11, Sec. 8, of the State Constitution and the Fourteenth Amendment to the Federal Constitution.

It appears from the record that products of the Reed Oil Company are all produced in another State and are shipped to this State where they are sold and distributed. It also appears that Reed Oil Company does not re-

ship nor transport any of its products after their arrival here to another State for any purpose. A stipulation in the record shows:

"1. Defendant, Reed Oil Company, is a corporation, and was organized in 1922 and has since been engaged in business as a dealer, both as wholesaler and jobber, in petroleum products in Davidson and Madison Counties, Tennessee.

"2. Defendant paid the coal oil and gasoline inspection fees on all products sold by it up to July 1, 1924, since which time it has failed and refused to pay such inspection fees; but it then and has since offered to pay, and has been ready, able and willing to pay, its proportionate part of the expense to the State of making inspection.

"3. Said defendant has likewise wholly failed and refused to pay the one-half cent tax prescribed by chapter 54 of the Acts of 1925.

"4. The number of gallons of oil and gasoline sold by said defendant from July 1, 1924, to December 31, 1925, inclusive, upon which it has paid neither inspection tax nor one-half cent gasoline tax is as shown in Exhibit A to the bill in the cause Rule No. 37413.

"5. Almost all petroleum products sold in Tennessee are manufactured in other parts of the United States and shipped into Tennessee, and this was true of all products handled by defendant, Reed Oil Company. Such products were and are brought in by dealers in various forms, quantities and containers; some are in barrels and casks, which are then by dealers resold to their customers in the original unbroken containers. Also a portion of such commodities were and are shipped to dealers in railroad tank cars, and in instances are resold to customers

in such tank cars without being unloaded or broken, while in other instances the cars are unloaded and the contents transferred to the dealers' storage tanks; in other instances products are sold to consumers on orders taken before shipment and shipped from other states direct to purchaser. The greater portion of the products are stored in storage tanks of dealers and delivered to customers and consumers by tank wagons or service station pumps. No distinction is made by the State's inspectors between any of said commodities, and no claim until now has been made by any dealer that any particular portion of his commodity is exempt from payment of inspection fees. This particular defendant does not reship or transport any of its products to other states.

"6. The following shows the aggregate inspection fees collected by the state and also the cost thereof to the state, including salaries and expenses, for the several periods from 1915 to 1925, inclusive:

|  | Amount Collected | Cost to State |
|---|---|---|
| For the biennial period from 1922 to 1924 | $769,725.03 | $38,784.79 |
| For the biennial period from 1920 to 1922 | 645,455.93 | 36,229.52 |
| For the biennial period from 1918 to 1920 | 401,468.53 | 24,321.85 |
| For the biennial period from 1917 to 1918 | 317,912.75 | 27,783.71 |
| For the biennial period from 1915 to 1917 | 163,948.10 | 24,364.79 |

"7. There are approximately 100 wholesale dealers and jobbers in Tennessee who are engaged in the same

business that defendant, Reed Oil Company, is engaged in. Many of them have, like said defendant, failed and refused to pay inspection fees since August 1, 1924, and the ½ cent privilege tax since its passage in April, 1925. Others have paid the inspection fees falling due, and such as have paid inspection fees, have not and will not be required to pay the ½ cent privilege tax under chapter 54, Pub. Acts 1925.

"8. The quantity of gasoline reported by the State inspectors as having been inspected in 1924 was 2,066,455 gallons less than the quantity upon which the 2 cent privilege tax under Acts 1923 was paid through the Excise Tax Department in that year.

"9. As shown in Section 4 hereof, the number of gallons sold by defendant from July 1, 1924, to December 31, 1925, upon which no inspection fees have been paid is 4,008,513; and if the defendant is liable for said fees, then the amount of its liability for the period from July 1, 1924, up to December 31, 1925, would be $16,704.90 exclusive of interest and costs.

"10. As shown in section 4 hereof, the number of gallons of oil and gasoline sold by said defendant from and after the taking effect of the one-half cent privilege tax on April 11, 1925, up to and including December 31, 1925, is 2,507,749, and if defendant is held bound to pay the one-half cent tax, then the amount of its liability for that tax from April 11, 1925, to December 31, 1925, would be $12,538.75 exclusive of interest and costs.

"11. Defendant denies in its answer that the petroleum products involved have been inspected by the state as required by its inspection laws. This stipulation shall not be construed as admitting inspection, but that issue is left as made by the pleadings, and either

party may take such proof pertaining thereto as desired within thirty days from this date; three days' notice of time and place of taking depositions shall be sufficient for either party to give the other.''

Defendant states in its answer that a large and undeterminable portion of the petroleum products that are shipped into Tennessee is interstate commerce, and that the inspection fees levied thereon by the State constitutes a burden upon, and an attempt to regulate interstate commerce in violation of the commerce clause of the Federal Constitution, U. S. Const., art. 1, section 8, cl. 3. Whether this statement in the answer refers to such products generally, or is intended to apply to the defendant's business does not clearly appear from the answer. It does appear from the stipulation that the greater portion of the products that Reed Oil Company sends in the State is placed in the storage tanks of dealers and delivered to consumers by tank wagons or service station pumps.

Numerous depositions were taken, but this evidence is confined altogether to the diligence and activity of the State's inspectors. It does appear, however, from the deposition of Mr. H. G. Buchanan that he is the warehouseman for the Reed Oil Company in Nashville, Tennessee, having charge of the Company's stock and of the unloading of all cars, and that he also has supervision of loading oil into tank wagons, and the distribution of the products of Reed Oil Company in Tennessee. The record is silent as to the quantity of the defendant's products, if any delivered directly upon orders to customers in this State, and which were subjects of interstate commerce.

Chapter 33, Pub. Acts of 1917, and related Acts, pro-

18

vide for the inspection of coal oil, gasoline, and other petroleum products sold or offered for sale or used in this State. The Act includes no express or implied purpose to impose inspection fees upon such products so as to burden interstate commerce. When these Acts are construed altogether they express the intention of the Legislature not only to cause the inspection of these inflammable products in the exercise of the State police power, but express the purpose to accompany that Act by the imposition of fees far in excess of the salary of the various inspectors, and the expense of inspection provided for in Chapter 13, Act of 1899, Chap. 33, Pub. Acts 1917.

In the absence of restraining legislation by Congress or some limitation imposed by the State or Federal Constitution, the Legislature may exact inspection fees on petroleum products in excess of the actual cost of inspection as a means of producing revenue. Touching inflammable products, the State may in the exercise of the police power inspect and collect fees upon such products as are within the State, as a means of safety even though moving in interstate commerce, but where the Act is strictly a police regulation, the inspection fees cannot exceed the reasonable cost of inspection. *Pure Oil Co.* v. *Minnesota,* 248 U. S., 158, 39 S. Ct., 35, 63 L. Ed., 180. After such products have come to rest in the State and have ceased to be interestate commerce, the State may impose inspection fees in substantial excess of the cost of inspection as a means of providing general revenue for the State. *Texas Co.* v. *Brown,* 258 U. S., 466, 42 S. Ct., 375, 66 L. Ed., 721; *Standard Oil Co.* v. *Graves,* 249 U. S., 389, 39 S. Ct., 320, 63 L. Ed., 662; *Askren* v. *Continental Oil Co.,* 252 U. S., 444, 40 S. Ct., 355, 64 L. Ed., 654.

██ ██ The intention of the Legislature to exact these fees as a means of producing revenue is, we think, clearly expressed when the Acts relating to the subject are construed together.

Chapter 349, Acts of 1899, and Chapter 33, Pub. Acts of 1917, provide for the inspection of all inflammable petroleum products, and the latter Act was passed without reducing the inspection fees. Long before its passage Chapter 13, Acts of 1899, limiting the compensation of inspectors and requiring the excess fees paid into the State Treasury was passed. As was Chapter 282, Acts of 1899, which required dealers in such products to make itemized quarterly reports of the products inspected and the inspection fees that had accrued. Following these Acts is Chapter 54, Pub. Acts of 1925, which imposes one-half a cent a gallon tax on all such products that escape the payment of inspection fees. These Statutes indicate a fixed policy, and express a manifest purpose on the part of the Legislature to impose the fees as a means of revenue insofar as the fees may exceed the cost of inspection. This purpose could not extend to such products as were objects of interstate commerce and is expressly limited to intrastate commerce in Section 1, Chapter 33, Pub. Acts of 1917, in the following words:

''All gasolines and all petroleum products . . . whether manufactured in this State or not shall be inspected as hereinafter provided in this Act before being sold or offered for sale or used in this State.''

██ A provision of the former Act caused the inspection of products in transit, but since such products as are interstate commerce may be separated from such, as are intrastate commerce, and since the fee or tax levied by the Act is separable and may be applied to the taxable

commodity avoiding any burden upon interstate commerce, the Act does not violate the commerce clause of the Federal Constitution. *Bowman* v. *Continental Oil Co.,* 256 U. S., 642, 41 S. Ct., 606, 65 L. Ed., 1139.

The case of *Foote & Co.* v. *Stanley,* 232 U. S., 494, 34 S. Ct., 377, 58 L. Ed., 698, is not controlling. The principle upon which the inspection Acts may be sustained as revenue measures is that which authorizes the imposition of license fees and other regulatory measures under which revenue is taken by the State. 37 C. J., (7), 171; 32 C. J., (11), p. 936.

Through the second assignment of error it is insisted that Chapter 54 of the Pub. Acts of 1925 is arbitrary and makes a capricious classification of dealers in petroleum products whose products are not inspected and impose a tax of one-tenth of a cent a gallon on their products in excess of the fees levied by the inspection Act, and that the Act violates Article 1, Section 8, and Article 11, Section 8, of the State Constitution and the Fourteenth Amendment.

The classification rests upon a good reason. It appears from the record that in 1924 two million gallons of petroleum products avoided payment of the inspection fees in Tennessee, and this no doubt moved the Legislature to classify those whose products escaped the tax and to impose upon that class a privilege tax in lieu of the inspection fees. The Act cannot be held capricious or arbitrary in its classification, because it affords all dealers an equal opportunity of falling into either class. If the inspection fees are paid the tax imposed by Chapter 54, Pub. Acts of 1925, cannot be exacted by the State. If the dealer does not want to be annoyed by the delays incident to inspection, he is required to pay a slightly

higher privilege tax imposed upon his uninspected petroleum products. The voluntary act of the dealer determines the classification and no privilege is conferred on any dealer that is not afforded to all other dealers, and no obligation is imposed upon any dealer to pay the privilege tax if he has paid the inspection fees which, as stated, are slightly less than the privilege tax.

Both acts are valid. A difficulty arises under this record from the fact that the amount of defendant's interstate business which it says suffered the burden of the tax is not shown. There is no evidence to indicate the interstate items alleged to have been taxed, although it appears that the amount of interstate business was very small. It was stipulated that if the State is entitled to recover inspection fees, the recovery should be $16,-704.90.

The Chancellor gave a decree for the inspection fees, a portion of which covered the period from July 1, 1924, to April 11, 1925, when Chapter 54, Pub. Acts of 1925, became effective.

The defendant sets up in its answer that some of its products on which the State is seeking to collect the fees and tax was interstate business and not taxable, and that insistence seems to run through the assignments of error and briefs in this Court, but is directed at the validity of the Acts rather than to its unauthorized application to particular items. The issue as to the imposition of the tax upon a portion of its products was ignored in the proof, and the stipulation in the record reflects no light upon it.

If any items of tax constituted a burden on defendant's interstate business and are included in the aggregate of the Chancellor's decree they should be deducted because

not subject to the tax. The items are distinguishable so that the tax may be applied to the intrastate business alone. Counsel for the State and the defense may agree upon what, if any, items that constitute the aggregate of the Chancellor's decree would be a burden on defendant's interstate business and deduct the same. If they do not agree, the cause is remanded to enable the Chancellor by reference or otherwise to ascertain what, if any, items included in the above aggregate of the tax would be a burden on interstate commerce, and deduct the amount so as to limit the tax exclusively to defendant's intrastate business.

The defendant will pay the costs of appeal, and if the cause is remanded costs of the trial Court will abide a final decree. Otherwise the defendant will pay the costs of the cause.

## On Petition to Rehear.

Mr. Justice Cook delivered the opinion on Petition to Rehear.

The Acts of 1899 and 1917 are clearly revenue measures. The intention of the Legislature is evinced by the wide margin between the small aggregate of salaries allowed inspectors and the aggregate of revenues produced from the fees exacted. We did not confuse the two Acts but considered them as one entire legislative plan to produce revenue for the State Government.

The petition to rehear presents no question not discussed in oral argument, in the briefs of counsel and in the brief of the *amicus curiae*; and all of the questions presented were considered by the Court in determining the matters involved.

██ It is apparent from the record that if Defendant's oil was not inspected it was because of its refusal to hold the oil awaiting inspection or to submit samples according to a prevailing custom among all oil dealers. The defendant could not by its apparent purpose to evade inspection escape its liability for inspection fees.

Petition denied.