Esso Standard Oil Co. *v.* Evans, Com'r of Finance & Taxation.

*(Nashville,* December Term, 1951.)

Opinion filed June 7, 1952.

Rehearing denied July 11, 1952.

Appeal to U. S. Supreme Court, Affirmed May 4, 1953.

WALKER & HOOKER, CUMMINGS & CRABTREE, JOE BROWN CUMMINGS and K. HARLAN DODSON, JR., all of Nashville, for Evans.

WALLER, DAVIS & LANSDEN, of Nashville, for Esso Standard Oil Co.

ELLIS N. SLACK, Acting Assistant Attorney General, and BERRYMAN GREEN, of Washington, D. C., Special Assistant to the Attorney General, for the United States, intervenor.

MR. JUSTICE GAILOR delivered the opinion of the Court.

The bill in this cause was filed to recover certain gasoline taxes paid under protest by the complainant on demand of the defendant. In the Chancery Court, because certain governmental immunity was asserted, the Chancellor permitted the United States Government to file an intervening petition. For brevity and to conform with the method adopted by the parties, we will refer, in this opinion, to the complainant as ''Esso;'' to the defendant as ''State;'' and to the intervenor as the ''United States.''

The controversy rises out of services performed by Esso for the United States under written contracts which are exhibited. These contracts between United States and Esso contained indemnifying clauses which provide for payment by the United States of any state taxes for which Esso may be made liable on account of its activities under the contracts.

During the war years the United States was purchasing at the refineries, all 100-octane and higher octane gasoline used in aviation. From the refineries, the gas was moved, usually by common carrier, and principally by

river barge, to various storage points. The United States had no storage facilities nor personnel to store and handle the gasoline, and for these services contracted with private corporations.

Esso owned certain storage tanks at Memphis, and rented others from the Lion Oil Company, and then contracted with United States to store the aviation gasoline belonging to the United States, in these tanks, and with Esso personnel to distribute the gas from these tanks on order of the United States.

The gasoline came up the Mississippi River by barge from Louisiana, where it had been purchased by the United States. When it arrived at Memphis, and while it was still on the barges, it was inspected by State officers, and thereafter pumped by Esso from the barges into its storage tanks, or in some cases, into tank trucks, and thereafter delivered to various Army posts on order of the United States. Some of these Army posts were in Tennessee, and others were in Arkansas and Mississippi.

Activity under the contracts here involved, commenced in 1943, and continued through the years 1944, 1945 and 1946. Since the Statute of Limitations had run on any taxes which accrued for the year 1943, the present suit was filed to recover taxes in the amount of $295,810.10, which had been paid under protest for the month of January 1944, after the State had prepared a distress warrant and threatened to have it served. It is agreed that the present suit is a test case, and will determine liability for taxes for the balance of the year 1944, and for the years 1945 and 1946. During the years when the contracts were in operation and Esso was rendering its services to the United States, inspection reports were rendered the Department of Finance and Taxation, and

discussions were had with the State regarding tax liability. No formal decision of such liability was ever made, either by the then Commissioner, or by the Attorney General. Esso insists that it relied on the contemporaneous and continued administrative construction of the then officers of the State, and that they concluded that Esso was not liable for any gasoline taxes in connection with the gasoline of the United States upon which Esso was rendering services under its contracts. The State, on the other hand, insists that the matter of liability was held in abeyance and was uncertain, and that Esso was never formally advised by any responsible authority, that it was not liable for these taxes.

Under the contracts, Esso received as compensation, amounts ranging from $18/100$ of a cent to $6\frac{3}{10}$ cents a gallon for receiving and storing in its own facilties and those leased from others, the gasoline belonging to the United States. Also it received varying amounts for gasoline distributed by its own facilities, or delivered to carrier on order of the United States.

From this, we conclude that the questions presented for decision by this litigation are three, namely:

(1) On the facts stated, was Esso liable for inspection fees under Code Sec. 6821?

(2) Was Esso liable for privilege tax for such operations under Code Sec. 1126.1 et seq.?

(3) Was Esso liable for interest and penalties?

The Chancellor held that Esso was not liable for (1) and (3), but was liable for (2), and from those parts of the decree which were adverse, all parties have perfected appeals.

We consider first, the question of liability of Esso under Code Sec. 6821, for the inspection fees. That section provides that every consignment of volatile substances, as such substances are defined in previous sections of the Code, shall be inspected, and for such inspection, a charge shall be made to "the consignor or consignee," of 20 cents a barrel. Fifty gallons shall constitute a barrel, and the full charge made for any fraction of such barrel.

That this inspection fee is not merely a service charge but is a revenue measure and an excise tax on the commodity, has been held in a number of our reported cases. State, ex rel. Fort v. City of Jackson, 172 Tenn. 119, 110 S. W. (2d) 323; Texas Co. v. McCanless, 177 Tenn. 238, 148 S. W. (2d) 360.

From Judge Cook's discussion of the nature of the tax and its purpose in *State* v. *Reed Oil Co.*, 176 Tenn. 10, 19-20, 137 S. W. (2d) 292, it is clear that the tax is laid upon the commodity itself, as an excise. In the present case, the gasoline, while it was in the barges on the river, and also while it was in the storage tanks on the bank, was admittedly the property of the United States. The inspections were made before the contract of Esso came into play, and before Esso had pumped the gasoline from the barge into its storage tanks. We, therefore, agree with the Chancellor, that the State has no power to levy a tax on property of the United States under these admitted facts.

We come next to the consideration of the second question, and Esso's liability for the privilege tax under Code Sec. 1126 et seq. This privilege tax has also been defined by reported decisions of this Court.

"This case (*Foster & Creighton Co.* v. *Graham,* 154 Tenn. 412, 258 S. W. 570, 47 A. L. R. 971) settled the proposition that the tax * * * is a privilege tax on the engaging in the business of storing gasoline based on the number of gallons in storage." *Texas Co.* v. *Fort,* 168 Tenn. 679, 687, 80 S. W. (2d) 658, 661.

"Chapter 58, Tennessee Public Acts 1923, as amended by chapter 67, Tennessee Public Acts 1925, is said, by its caption, to impose a privilege tax on 'persons * * * and corporations engaged in or carrying on the business * * * of selling or storing or distributing gasoline * * *,' * * * Storage of the gasoline and withdrawal of it from storage within the state for use or sale are, as the State Supreme Court has held, the events which, by the very terms of the statute, call it into operation. *Foster & C. Co.* v. *Graham,* 154 Tenn. 412, 420, 285 S. W. 570, 47 A. L. R. 971; *Quick Service Tire Co.* v. *Smith,* 156 Tenn. 96, 102, 299 S. W. 807." *Nashville C. & St. L. RR. Co.* v. *Wallace,* 288 U. S. 249, 265, 53 S. Ct. 345, 349, 77 L. Ed. 730.

Esso contends that it is a condition precedent to liability for this tax, that the taxpayer shall have imported the gasoline. While we find no support for this argument in the cases cited above, in the present case, it is unnecessary to decide that question since technically Esso did import the gasoline into Tennessee by removing it from the channels of interstate commerce on the barges on the river into its trucks and tanks on the bank.

Further, Esso insists that the decision in *Tennessee Oil Co.* v. *McCanless,* 178 Tenn. 683, 157 S. W. (2d) 267, 162 S. W. (2d) 1081, relieves it from liability in the

present case. We find that case clearly distinguishable on the facts. In that case, the Obion County Board of Education rented a storage tank from the Tennessee Oil Company, with an agreement that it would pay the Tennessee Oil Company a fee of two cents a gallon for distributing the gas on order of the Board. In legal effect, the Board of Education, which was exempt, was storing gasoline in its own tank. Although the rental of the storage tank was a nominal amount, it had the effect of changing the status of the Tennessee Oil Company from that of an independent contractor to that of an agent or servant of the Board. In the present case, the charge which Esso made the United States for storage alone was a very substantial and lucrative business considering the vast amount of gasoline involved, since the contracts show that Esso charged from $18\frac{1}{100}$ of a cent to $6\frac{3}{10}$ cents per gallon for receiving and storing the gasoline in its tanks. This was particularly true, as the State insists, since at the time of these contracts the United States owned all gasoline of this quality, and without this Government business, Esso would have had no lucrative return on its tanks, and made no money with which to pay its personnel.

We conclude, therefore, that Esso was properly assessed with privilege taxes defined in Code Sec. 1126, et seq.

█ Esso further insists that some of the gasoline received in the Memphis tanks was later, on order of the United States, exported to Mississippi and Arkansas. As to the exported gasoline, it is insisted that if liable at all for the privilege tax, it is liable only for the tax at the export rate of $\frac{1}{20}$ of one cent per gallon. Esso kept no figures of the amount of the exported gasoline, and made

no return showing those figures to the Department of Finance and Taxation, as the law requires. Apparently, it is impossible at this point, to establish with any accuracy, what those figures were. Since, under the frame of the Act, the assessment for the tax is made on the returns of the taxpayer, and since the taxpayer is claiming the exemption, the burden was on the taxpayer to show the exact amount of the gasoline exported, in order to avoid the higher rate. *Hamilton Nat'l Bank* v. *McCanless*, 176 Tenn. 570, 144 S. W. (2d) 768; *Fidelity-Bankers Tr. Co.* v. *McCanless*, 181 Tenn. 476, 181 S. W. (2d) 747.

As to Esso's insistence that by reason of the fact that the State made no demand for the taxes when they became due, and that State officers acquiesced in the non-payment of taxes, that the State is now estopped and precluded from collecting the taxes, it is only necessary to say that there was never any formal remission of these taxes by any responsible authority, and there is substantial evidence in the record that the matter of taxability was held in abeyance and never decided. In any event, it is general law, 31 C. J. S., Estoppel, Sec. 140-b, p. 412, which has many times been followed by this Court, *Nat'l Life & Acc. Ins. Co.* v. *Dempster*, 168 Tenn. 446, 79 S. W. (2d) 564; *R. J. Reynolds Tobacco Co.* v. *Carson*, 187 Tenn. 157, 213 S. W. (2d) 45; *American Bemberg Corp.* v. *Carson*, 188 Tenn. 263, 219 S. W. (2d) 169, that a mistaken construction of the law by a public officer cannot work an estoppel against the State in the collection of its revenue. The record does not show that Esso was prejudiced in any way by a failure to collect the tax. *State* v. *McPhail*, 156 Tenn. 459, 460, 2 S. W. (2d) 413.

Finally, we consider the third question, and the assignment by the State, that the Chancellor committed

error in remitting interest and penalties on the taxes. Under the facts of this case, where there had been no formal demand by collectors at the time the taxes were due, and when there was a bona fide doubt of tax liability, the remission of interest and penalty was within the sound discretion of the Chancellor on principles of equity. *East Tennessee Brewing Co.* v. *Currier,* 126 Tenn. 535, at page 551, 150 S. W. 541, at page 545, where Judge Green cites with approval, the following statement from Cooley on Taxation:

"* * * 'the penalty should not be exacted if the delay came from serious doubt of the validity of the tax.' " Cooley on Taxation, Vol. 2, p. 901.

"This controversy is being waged in a court of equity and this Court, since *East Tenn. Brewing Co.* v. *Currier,* 126 Tenn. 535, 150 S. W. 541, has exercised the power of remitting penalties imposed upon taxpayers when the equities of the case seem to demand. See also *Shipp* v. *Cummings,* 158 Tenn. 526, 14 S. W. (2d) 747, and *State et al.* v. *Rowan et al.,* 171 Tenn. 612, 106 S. W. (2d) 861." *Memphis Nat. Gas Co.* v. *McCanless,* 180 Tenn. 695, 705-706, 177 S. W. (2d) 843, 847.

From the foregoing authorities, we conclude that the matter of the remission of interest and penalty was within the sound discretion of the Chancellor, and on the facts of this case, we find no abuse of that discretion.

 Finally, we consider the intervening petition of the United States and its assertion of "implied immunity." We observe that any liability of the United States, under our decision, is the result of private contract with Esso, and not the result of State action. In argument, it was stated by counsel for the United States,

that the authority upon which insistence for immunity is based, is the decision of the Supreme Court of the United States in *U. S. v. Allegheny County,* 322 U. S. 174, 64 S. Ct. 908, 88 L. Ed. 1209. Since we have held that Esso was only liable for the privilege tax under Code Sec. 1126 et seq., and since the only tax involved in U. S. v. Allegheny County, supra, was an ad valorem tax on personal property of the United States, we do not find that case in point here. That Esso was liable for the privilege tax for doing business in the State, though that business was done entirely with property of the United States is settled, we think, by *James v. Dravo Contracting Co.,* 302 U. S. 134, 58 S. Ct. 208, 82 L. Ed. 155; *State of Alabama v. King & Boozer,* 314 U. S. 599, 62 S. Ct. 118, 86 L. Ed. 3; *Curry v. U. S.,* 314 U. S. 14, 62 S. Ct. 48, 86 L. Ed. 9. In the course of the last opinion, which was by Mr. Chief Justice Stone, it was said:

"As pointed out in the opinion in the King & Boozer case, by concession of the Government and on authority, the Constitution, without implementation by Congressional legislation, does not prohibit a tax upon Government contractors because its burden is passed on economically by the terms of the contract or otherwise as a part of the construction cost to the Government." *Curry v. U. S.,* 314 U. S. 14, 62 S. Ct. 49, 86 L. Ed. 9, 11.

This rule was strengthened by the later cases of *Penn. Dairies v. Milk Control Comm.,* 318 U. S. 261, 87 L. Ed. 748, and *Mayo v. U. S.,* 319 U. S. 441, 63 S. Ct. 1137, 87 L. Ed. 1504.

From these opinions of the Supreme Court of the United States, we conclude that if Tennessee sought to tax the gasoline which was stored, the tax would be in-

valid. Such would be the effect of our approval of the tax under Section 6821 of the Code. In like manner, if the United States was storing its gasoline *in its own tanks,* the tax would be invalid, but in this case we have approved only the tax on Esso for exercising the privilege of doing business in Tennessee by storing and distributing gasoline which was the property of the United States. The validity of that tax follows from the decisions in *State of Alabama* v. *King & Boozer,* supra, and *Curry* v. *U. S.,* supra.

All assignments of error are overruled and the decree of the Chancellor is affirmed. The parties will divide the costs of the appeal.