## DRAVO CONTRACTING CO. v. FOX, Tax Com'r.
### No. 3492.

District Court, S. D. West Virginia.

Oct. 1, 1936.

William S. 'Moorhead, of Pittsburgh, Pa., and W. Chapman Revercomb, of Charleston, W. Va. (Moorhead & Knox, of Pittsburgh, Pa., Koontz, Hurlburt & Revercomb, of Charleston, W. Va., Lawrence D. Blair, of Pittsburgh, Pa., and W. Elliott Nefflen, of Charleston, W. Va., on the brief), for plaintiff.

Homer A. Holt, Atty. Gen., of West Virginia (W. Holt Wooddell, Asst. Atty. Gen., on the brief), for defendant.

Before NORTHCOTT, Circuit Judge, and WATKINS and McCLINTIC, District Judges.

NORTHCOTT, Circuit Judge.

The court makes the following findings of fact and conclusions of law:

#### Findings of Fact.

There is no dispute as to the facts as they were stipulated. The stipulation shows the following material facts:

The plaintiff, Dravo Contracting Company, is a Pennsylvania corporation, created under the laws of that state, with its principal office and factories in Pittsburgh, Pa. It is engaged in the general contracting business and is admitted to do business as a foreign corporation in the state of West Virginia.

During the years 1932 and 1933 the plaintiff entered into four written contracts .with the United States of America agreeing to construct locks and dams in the Kanawha river and locks in the Ohio river, both navigable streams. These 'locks and dams are constructed at or near points on said rivers known as Marmet, London, and Winfield, W. Va., on the Kanawha river, and near Gallipolis, Ohio, on the Ohio river, within the exterior boundaries of the state of West Virginia, and were being constructed` primarily in the aid of navigation.

These contracts were entered into in the following manner: · The United States gave notice of a proposed work and invited bids. The notice and .invitations were mailed from Huntington, W. Va., and received by the plaintiff at its office in Pittsburgh, Pa. The plaintiff prepared its bid, together with the required bid bond, at its office in Pittsburgh and conveyed same by special messenger to the office of the United States

engineer at Huntington, W. Va. On the acceptance of the plaintiff's bid on the four projects, written contracts and performance bonds were prepared by the United States and forwarded by mail from Huntington, W. Va., to the plaintiff at Pittsburgh, at which latter point the plaintiff executed said contracts and bonds and forwarded same by mail to the office of the United States Engineer at Huntington, W. Va. In each instance the performance bonds were approved by the Judge Advocate General of the War Department of the United States Government, at Washington, D. C.

Payments of the amount received by the plaintiff under the several contracts were made monthly, or semimonthly, by checks drawn by a disbursing officer of the War Department of the United States, at Huntington, W. Va., on the United States Treasury, and were delivered by mail from Huntington, W. Va., to the office of the plaintiff at Pittsburgh, Pa. These payments were based upon estimates made by representatives of the United States for materials delivered to, and for materials fabricated during the particular month by, the plaintiff at its Neville Island Shops at Pittsburgh, Pa., for use in said locks and dams as provided by the respective contracts and estimates made from time to time as the locks and dams were erected. A retained percentage of 10 per cent. on each estimate was paid upon the final acceptance of the completed work.

During the years 1933 and 1934 plaintiff completed the performance of its contracts pertaining to the locks and dams at Marmet and London and completed performance of its contract at Winfield in February, 1935. The locks at Gallipolis have been partially completed, and the plaintiff is now engaged in the further performance of that contract. For the work so performed during the years 1933 and 1934 plaintiff received the gross sum of $6,634,462.29.

Certain parts of the locks and dams built by the plaintiff were fabricated at its shops at Neville Island, Pittsburgh, and moved to the various locations by the plaintiff. Partial payments were made by the government to the plaintiff on some of these parts so fabricated before they were moved from plaintiff's plant. Certain materials were purchased outside the state of West Virginia and shipped to the plaintiff's plant at Pittsburgh. Part of the labor employed was hired at each of the respective sites of construction, and certain expert workmen and foremen were sent from outside into the state.

The estimates of cost and the bids based thereon did not include, and there was not included, in the contract price paid to the plaintiff by the United States, any specified item to cover the West Virginia gross income tax. The plaintiff, however, at the time of making such estimates and bids knew of the Gross Sales and Income Tax Law of West Virginia.

The United States, with the consent of the state of West Virginia, acquired, by purchase or condemnation, the land on both sides of the navigable streams upon which said locks and dams were constructed. In addition to the land owned by the United States, the plaintiff leased from private owners near the Marmet lock and dam two lots which were occupied and used from time to time for storing materials and machinery, and the plaintiff used a roadway across one of the lots so leased. Plaintiff leased one acre of land from private owners near the Winfield lock during the construction and used same to store materials. Plaintiff also leased two acres of land from a private owner in West Virginia near the Gallipolis locks, and used same to store materials and for the erection of temporary small buildings.

The United States constructed said locks and dams primarily for the development and improvement of navigation, incidentally aiding in the control of floods in said rivers. The dams were so designed and constructed as to permit the United States to use or license the use of water power thereby created for generation of electricity, and the United States has granted to a private corporation a license to use the water power resulting from the damming of the river at Marmet and at London. This license provides that nothing can be done to interfere with navigation.

The statutes of the state of West Virginia consenting to the acquisition of lands by the United States are found in article 1, chapter 1, of the Code of West Virginia.

In the years 1933 and 1934 the plaintiff performed work in the state of West Virginia for persons other than the United States government and made returns and paid taxes upon the gross income from such work and, in the same years, paid ad valorem property taxes to the state of West

Virginia, and its political subdivisions, on its personal property in the aggregate amount of $5,790.62. The plaintiff has also paid the state the tax required of a foreign corporation for doing business in the state. The tax here involved is an additional charge.

The defendant is the duly qualified and acting State Tax Commissioner of the State of West Virginia, charged with the duty of enforcing the taxing statutes of the state of West Virginia and empowered to collect the taxes here involved. The defendant has his office in the city of Charleston in the Southern District of West Virginia, and is domiciled and is a resident in the Southern Judicial District of said state.

The defendant has made an assessment against the plaintiff for the calendar years 1933 and 1934 in the sum of $135,761.51, taxes and penalties, exclusive of interest, upon the gross amounts received by the plaintiff during said years from the United States government under the contracts above mentioned. The defendant has notified the plaintiff of said assessment, and has also notified it that unless said amount so claimed is paid immediately, the defendant would be forced to proceed in accordance with the law to collect the same and to distrain on the property of the plaintiff.

The assessment so made by the defendant against the plaintiff was under the provisions of the Gross Sales and Income Tax Law of West Virginia, article 13, chapter 11, Code of West Virginia 1931, and as amended, effective May 26, 1933 (Acts 1933, 1st Ex.Sess., c. 33), for the years 1933 and 1934. Said law makes no provision for payment under protest and recovery back by the taxpayer, and it was admitted in the pleadings and the argument that the plaintiff had no adequate remedy at law if its contention that the tax is not collectible is sustained. The tax sought to be imposed was 2 per cent. of the gross amount received by the plaintiff under the contracts.

A distraint by the defendant upon the plaintiff's property, at present used in plaintiff's work under the contracts, would stop said work or materially interfere therewith.

The necessary amount to give this court jurisdiction is involved.

A temporary restraining order has been issued pending the hearing, and it was agreed at the hearing that the cause should be finally submitted for determination as to whether the permanent injunction should be issued.

### Conclusions of Law.

The court concludes that there is involved in this suit the necessary amount to give the District Court of the United States for the Southern District of West Virginia jurisdiction of the cause.

That the plaintiff has no adequate remedy at law, and that a court of equity has jurisdiction of the issue.

That the United States government in the erection and construction of the locks and dams was engaged in a project for which it had full authority under the Constitution of the United States and was in the exercise of a proper function for the improvement of navigable rivers.

That the imposition of the tax here involved constitutes a direct burden upon a lawful and proper project of the United States government, and that the state of West Virginia has no power to impose upon and collect from the plaintiff this tax.

That the plaintiff is entitled to the relief prayed for.

### Opinion.

This is a suit in equity, brought by the plaintiff, seeking to restrain the collection of certain taxes sought to be imposed by the state of West Virginia. A District Court of three judges, organized in accordance with section 266 of the Judicial Code, as amended (28 U.S.C.A. § 380), heard the case on complainant's application for interlocutory and permanent relief. At the hearing no evidence was taken, the cause was submitted on a stipulation of facts, and it was agreed that the hearing should be final.

The tax sought to be imposed upon the plaintiff is a gross sales and income tax and the rate of the tax is 2 per cent. For the purposes to be considered here there is a very distinct difference between a tax upon gross income and a net income tax. This point was discussed in the case of United States Glue Company v. Town of Oak Creek, 247 U.S. 321, 38 S.Ct. 499, 501, 62 L.Ed. 1135, Ann.Cas.1918E, 748, where the court said: "The difference in effect between a tax measured by gross receipts and one measured by net income, recognized by our decisions, is manifest and substantial, and it affords a convenient and workable basis of distinction between a direct and immediate burden upon

the business affected and a charge that is only indirect and incidental. A tax upon gross receipts affects each transaction in proportion to its magnitude and irrespective of whether it is profitable or otherwise. Conceivably it may be sufficient to make the difference between profit and loss, or to so diminish the profit as to impede or discourage the conduct of the commerce. A tax upon the net profits has not the same deterrent effect, since it does not arise at all unless a gain is shown over and above expenses and losses, and the tax cannot be heavy unless the profits are large."

. If the state of West Virginia is held to have the right to impose the tax here involved, every contractor submitting bids on any government project would necessarily have to add the amount of the gross tax to his estimate of the cost of doing the work. Such a tax would have to be paid whether there was any profit in the contract or not, and it seems clear that such a tax is a direct burden upon any improvement of this character and therefore a burden upon the United States in carrying out any projected proper public improvement.

In the judicial history of the United States it was early settled by the Supreme Court, in the case of McCulloch v. State of Maryland et al., 4 Wheat. 316, 436, 4 L.Ed. 579, that a state may not tax the operations carried on by the United States in the proper execution of constitutional powers vested in it. In that case Mr. Chief Justice Marshall said: "The Court has bestowed on this subject its most deliberate consideration. The result is a conviction that the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the constitution has declared."

This principle has stood in all the years following Chief Justice Marshall's decision.

In the case of Union Pacific Railroad Company v. William S. Peniston, 18 Wall. 5, 36, 21 L.Ed. 787, the court said: "It is, therefore, manifest that exemption of Federal agencies from State taxation is dependent, not upon the nature of the agents, or upon the mode of their constitution, or upon the fact that they are agents, but

upon the effect of the tax; that is, upon the question whether the tax does in truth deprive them of power to serve the government as they were intended to serve it, or does hinder the efficient exercise of their power. A tax upon their property has no such necessary effect. It leaves them free to discharge the duties they have undertaken to perform. A tax upon their operations is a direct obstruction to the exercise of Federal powers."

Even in the dissenting opinion of Mr. Justice Bradley, in that case he says: "In that case the contract is the means employed for carrying into execution the powers of the government, and the contract alone, and not the contractor, is exempt from taxation or other interference by the State government."

In Weston v. City Council of Charleston, 2 Pet. 449, 465, 7 L.Ed. 481, the court said:

"The tax in question is a tax upon the contract subsisting between the government and the individual. It bears directly upon that contract, while subsisting and in full force. The power operates upon the contract, the instant it is framed, and must imply a right to affect that contract. * * *

"The right to tax the contract to any extent, when made, must operate upon the power to borrow, before it is exercised, and have a sensible influence on the contract. The extent of this influence depends on the will of a distinct government; to any extent, however inconsiderable, it is a burden on the operations of government. It may be carried to an extent which shall arrest them entirely."

See, also, Choctaw, Oklahoma & Gulf Railroad Company v. Harrison, 235 U.S. 292, 35 S.Ct. 27, 59 L.Ed. 234; Indian Territory Illuminating Oil Company v. State of Oklahoma, 240 U.S. 522, 36 S.Ct. 453, 60 L.Ed. 779; Panhandle Oil Company v. Mississippi ex rel. Knox, 277 U.S. 218, 48 S.Ct. 451, 72 L.Ed. 857, 56 A.L.R. 583; Trinityfarm Construction Company v. Grosjean, 291 U.S. 466, 54 S.Ct. 469, 78 L.Ed. 918; Indian Motorcycle Company v. United States, 283 U.S. 570, 51 S.Ct. 601, 75 L.Ed. 1277.

The decisions are unanimous in holding that sales to the federal government are not subject to a tax by a state.

We are of the opinion that the tax here sought to be collected from the plain-

tiff is a direct burden upon the United States in contracting with the plaintiff rather than a tax upon the income of the contractor.

The United States in the construction of the locks and dams in question is engaged in the proper, lawful, and meritorious policy of aiding navigation. The right of the federal government to do this under the Constitution cannot be doubted. Such a tax would be a direct burden upon a proper activity of the federal government. The limit of such a tax would lie within the discretion of the State Legislature, and it could be fixed at such an amount as would not only impede but prevent the carrying out of projects of this character. In these days when vast projects are being carried on all over the country by the United States, it can readily be seen that the imposition, by all the states, of a tax of this character would amount to a vast sum and become a great burden upon the national government.

With the wisdom of a policy that would cause a state to seek to gain revenue from vast projects within its boundaries, projects that give employment to the citizens of that state, to gain revenue for the state, we are not concerned; we only have to deal with the question whether the state can so hamper legitimate activities of the United States. We do not think it can.

The defendant relies upon two cases to support its contention that the tax is lawful. The case of General Construction Company v. Fisher et al., 149 Or. 84, 39 P.(2d) 358, 97 A.L.R. 1252 (appeal dismissed for want of a substantial federal question, 295 U.S. 715, 55 S.Ct. 646, 79 L.Ed. 1671), and the case of Ralph Sollitt & Sons Construction Company v. Commonwealth of Virginia, 161 Va. 854, 172 S.E. 290, 91 A.L.R. 774 (appeal dismissed for the want of a substantial federal question, 292 U.S. 599, 54 S.Ct. 632, 78 L.Ed. 1463); but in neither of these cases was a gross tax involved. In the Oregon case an excise tax for the privilege of doing business within the state was involved and the tax was measured by net income, here the tax is measured by gross income. In that case money was advanced by the United States to carry out a reclamation project under the Department of Interior and this money was to be repaid as the reclaimed land was sold. In the Virginia case a license tax to do business as a foreign corporation was involved and not a gross tax. The plaintiff had paid a license tax to the state of West Virginia, as well as a direct property tax. This gross tax here sought to be collected is in addition to the taxes already paid by the plaintiff. We do not think that the decisions in these two cases are controlling of the issue here involved.

The case of Baltimore Shipbuilding & Dry Dock Company v. Mayor and City Council of Baltimore, 195 U.S. 375, 25 S.Ct. 50, 49 L.Ed. 242, also relied upon by the defendant, is not in point. In that case a land tax was involved and the court held that only the dock company's interest in the land was taxed; that the United States had no present right in rem; and the interest of the United States in the land was a condition subsequent.

It is also contended on behalf of the defendant that the fact that the dams were so constructed as to permit the use of the water power thus created to be used for the generation of electricity, by parties other than the government, justified the tax—we do not think so. Under the holding of the Supreme Court in the Tennessee Valley Cases, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688, the government having the right to erect the dam in the first place for a legitimate purpose has the right to make incidental use of the water power for the purpose of generating electricity and has the right to sell or lease the same.

It is further contended on behalf of the defendant that the fact that the contractor in some instances leased land adjoining the government land upon which the locks and dams were constructed justified the tax. This would unquestionably be true under the Virginia case above discussed, where the question involved is one of a tax upon the contractor. Here we reach the conclusion that the tax is upon the contract, and therefore upon the United States, and not upon the contractor. A number of other points have been raised both on behalf of the plaintiff and the defendant; but, in view of our conclusion as above set out, we do not think it necessary to discuss them.

For the reasons above given, the injunction prayed for will be awarded.