## JAMES, STATE TAX COMMISSIONER, v. DRAVO CONTRACTING CO.

No. 3.  Argued April 26, 27, 1937.  Reargued October 12, 1937.— Decided December 6, 1937.

136

*Mr. Clarence W. Meadows,* Attorney General of West Virginia, for appellant, on the original argument and the reargument. *Messrs. Homer A. Holt,* former Attorney General, and *W. Holt Wooddell,* Assistant Attorney General, were with him on the briefs.

*Mr. William S. Moorhead* for appellee, on the original argument and the reargument. *Messrs. Lawrence D. Blair, W. Chapman Revercomb,* and *W. Elliott Nefflen* were with him on the briefs.

*Solicitor General Reed,* with whom *Attorney General Cummings, Assistant Attorney General Morris,* and *Messrs. Sewall Key, J. Louis Monarch, Arnold Raum,* and *Francis A. LeSourd* were on the brief, for the United States as *amicus curiae,* by special leave of Court, on the reargument.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

This case presents the question of the constitutional validity of a tax imposed by the State of West Virginia upon the gross receipts of respondent under contracts with the United States.

Respondent, The Dravo Contracting Company, is a Pennsylvania corporation engaged in the general contracting business, with its principal office and plant at Pittsburgh in that State, and is admitted to do business in the State of West Virginia. In the years 1932 and 1933, respondent entered into four contracts with the United States for the construction of locks and dams in the Kanawha River and locks in the Ohio River, both navigable streams.[1] The State Tax Commissioner assessed respondent for the years 1933 and 1934 in the sum of $135,761.51 (taxes and penalties) upon the gross amounts received from the United States under these contracts.

Respondent brought suit in the District Court of the United States for the Southern District of West Virginia

---

[1] See Act of July 3, 1930, c. 847, 46 Stat. 928; H. Doc. No. 190, 70th Cong., 1st sess.; Act of August 30, 1935, c. 831, 49 Stat. 1035; H. Doc. No. 31, 73d Cong., 1st sess.

to restrain the collection of the tax. The case was heard by three judges (28 U. S. C. 380) and upon findings the court entered a final decree granting a permanent injunction. 16 F. Supp. 527. The case comes here on appeal.

The statute is known as the Gross Sales and Income Tax Law. Code of West Virginia 1931, c. 11, Art. 13, amended effective May 27, 1933. Acts of 1933, c. 33. It provides for "annual privilege taxes" on account of "business and other activities." The clause in question here is as follows:

"Upon every person engaging or continuing within this state in the business of contracting, the tax shall be equal to two per cent. of the gross income of the business."[2]

The tax was in addition to other state taxes upon respondent, to wit, the license tax on foreign corporations (Code of West Virginia, c. 11, Art. 12, §§ 69, 71) and *ad valorem* taxes upon real and personal property of the contractor within the State.

The questions presented are (1) whether the State had territorial jurisdiction to impose the tax, and (2) whether the tax was invalid as laying a burden upon the operations of the Federal Government.

After hearing we directed reargument and requested the Attorney General of the United States to present the views of the Government upon the two questions above stated. Reargument has been had and the Government has been heard.

*First.* As to territorial jurisdiction.—Unless the activities which are the subject of the tax were carried on within the territorial limits of West Virginia, the State had no jurisdiction to impose the tax. *Hans Rees' Sons* v. *North Carolina,* 283 U. S. 123, 133, 134; *Shaffer* v.

---

[2] Prior to May 27, 1933, the tax was three-tenths of one per cent, and the assessment on receipts prior to that date was at that rate. Two of the contracts of respondent were made before the rates were changed.

*Carter,* 252 U. S. 37, 57; *Surplus Trading Co.* v. *Cook,* 281 U. S. 647. The question has two aspects (1) as to work alleged to have been done outside the exterior limits of West Virginia and (2) as to work done within those limits but (a) in the bed of the rivers, (b) on property acquired by the Federal Government on the banks of the rivers, and (c) on property leased by respondent and used for the accommodation of his equipment.

1. A large part of respondent's work was performed at its plant at Pittsburgh. The stipulation of facts shows that respondent purchased outside the State of West Virginia materials used in the manufacture of the roller gates, lock gates, cranes, substructure racks and spur rims, structural steel, patterns, hoisting mechanism and equipment, under each of its contracts, and fabricated the same at its Pittsburgh plant. The roller gates and the appurtenant equipment were preassembled at respondents' shops at Pittsburgh and were there inspected and tested by officers of the United States Government. The materials and equipment fabricated at Pittsburgh were there stored until time for delivery, and the appropriate units as prepared for shipment were then transported by respondent to the designated sites in West Virginia and there installed. The United States knew at the time the contracts were made that the above described work was to be performed at the plaintiff's main plant. The contracts provided for partial payments as the work progressed and that all the material and work covered by the partial payments should thereupon become "the sole property of the Government." Payments by the Government were made from time to time accordingly.

It is clear that West Virginia had no jurisdiction to lay a tax upon respondent with respect to this work done in Pennsylvania. As to the material and equipment there fabricated, the business and activities of respond-

ent in West Virginia consisted of the installation at the respective sites within that State and an apportionment would in any event be necessary to limit the tax accordingly. *Hans Rees' Sons* v. *North Carolina, supra.*

2. As to work done within the exterior limits of West Virginia, the question is whether the United States has acquired exclusive jurisdiction over the respective sites. Wherever the United States has such jurisdiction the State would have no authority to lay the tax. *Surplus Trading Co.* v. *Cook, supra.*

(a) *As to the beds of the Kanawha and Ohio rivers.* The present question is not one of the paramount authority of the Federal Government to have the work performed for purposes within the federal province (*Scranton* v. *Wheeler,* 179 U. S. 141, 163; *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53, 61, 62; *Lewis Blue Point Oyster Co.* v. *Briggs,* 229 U. S. 82, 88), or whether the tax lays a burden upon governmental operations; it is simply one of territorial jurisdiction.

The title to the beds of the rivers was in the State. *Pollard* v. *Hagan,* 3 How. 212, 230; *Shively* v. *Bowlby,* 152 U. S. 1, 26; *Port of Seattle* v. *Oregon-Washington R. Co.,* 255 U. S. 56, 63; *Borax Consolidated* v. *Los Angeles,* 296 U. S. 10, 15, 16. It was subject to the power of Congress to use the lands under the streams "for any structure which the interest of navigation in its judgment may require." *Lewis Blue Point Oyster Co.* v. *Briggs, supra.* But, although burdened by that servitude, the State held the title. *Gibson* v. *United States,* 166 U. S. 269, 271, 272; *Port of Seattle* v. *Oregon-Washington R. Co., supra; Borax Consolidated* v. *Los Angeles, supra.* There does not appear to have been any acquisition by the United States of title to those lands, unless, as respondent urges, the occupation of the beds for the purpose of the improvements constituted an acquisition of title. But as the occupation was simply the exercise of the dominant

right of the Federal Government (*Gibson* v. *United States, supra,* p. 276) the servient title continued as before. No transfer of that title appears. The Solicitor General conceded in his argument at bar that the State of West Virginia retained its territorial jurisdiction over the river beds and we are of the opinion that this is the correct view.

(b) *As to lands acquired by the United States by purchase or condemnation for the purposes of the improvements.* Lands were thus acquired on the banks of the rivers from individual owners and the United States obtained title in fee simple. Respondent contends that by virtue of Article I, Section 8, Clause 17, of the Federal Constitution the United States acquired exclusive jurisdiction.[3]

Clause 17 provides that Congress shall have power "to exercise exclusive legislation" over "all places purchased by the consent of the legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings." "Exclusive legislation" is consistent only with exclusive jurisdiction. *Surplus Trading Co.* v. *Cook, supra,* p. 652. As we said in that case, it is not unusual for the United States to own within a State lands which are set apart and used for public purposes. Such ownership and use without more do not withdraw the lands from the jurisdiction of the State. The lands "remain part of her territory and within the operation of her laws, save that

---

[3] That provision is as follows:

"The Congress shall have power . . .

"To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."

the latter cannot affect the title of the United States or embarrass it in using the lands or interfere with its right of disposal." *Id.*, p. 650. Clause 17 governs those cases where the United States acquires lands with the consent of the legislature of the State for the purposes there described. If lands are otherwise acquired, and jurisdiction is ceded by the State to the United States, the terms of the cession, to the extent that they may lawfully be prescribed, that is, consistently with the carrying out of the purpose of the acquisition, determine the extent of the federal jurisdiction. *Fort Leavenworth R. Co.* v. *Lowe,* 114 U. S. 527, 538, 539; *Palmer* v. *Barrett,* 162 U. S. 399, 402, 403; *Arlington Hotel Co.* v. *Fant,* 278 U. S. 439, 451; *United States* v. *Unzeuta,* 281 U. S. 138, 142; *Surplus Trading Co.* v. *Cook, supra.*

Are the locks and dams in the instant case "needful buildings" within the purview of Clause 17? The State contends that they are not. If the clause were construed according to the rule of *ejusdem generis,* it could be plausibly contended that "needful buildings" are those of the same sort as forts, magazines, arsenals and dockyards, that is, structures for military purposes. And it may be that the thought of such "strongholds" was uppermost in the minds of the framers. Elliot's Debates, Vol. 5, pp. 130, 440, 511; Cf. Story on the Constitution, Vol. 2, § 1224. But such a narrow construction has been found not to be absolutely required and to be unsupported by sound reason in view of the nature and functions of the national government which the Constitution established.

In *Sharon* v. *Hill,* 24 Fed. 726, 730, 731, Justice Field (sitting with Judge Sawyer) considered the provision to be applicable to a court building and custom house on land which had been purchased with the consent of the State. In *Battle* v. *United States,* 209 U. S. 36, 37, we held that "post offices are among the 'other needful

buildings' " within Clause 17. See, also, *United States* v. *Wurtzbarger,* 276 Fed. 753, 755; *Arlington Hotel* v. *Fant, supra.* Locks and dams for the improvement of navigation, which are as clearly within the federal authority as post offices, have been regarded as "needful buildings." *United States* v. *Tucker,* 122 Fed. 518, 522. We take that view. We construe the phrase "other needful buildings" as embracing whatever structures are found to be necessary in the performance of the functions of the Federal Government.

The legislature of West Virginia by general statute had given its consent to the acquisition by the United States, but questions are presented as to the construction and effect of the consent. The provision is found in § 3 of Chapter 1, Article 1, of the Code of West Virginia of 1931. The full text is set out in the margin.[4] By the first paragraph the consent of the State is given "to the

---

[4] "Sec. 3. *Acquisition of Lands by United States; Jurisdiction.*—The consent of this State is hereby given to the acquisition by the United States, or under its authority, by purchase, lease, condemnation, or otherwise, of any land acquired, or to be acquired in this State by the United States, from any individual, body politic or corporate, for sites for lighthouses, beacons, signal stations, post offices, custom-houses, courthouses, arsenals, soldiers' homes, cemeteries, locks, dams, armor plate manufacturing plants, projectile factories or factories of any kind or character, or any needful buildings or structures or proving grounds, or works for the improvement of the navigation of any watercourse, or work of public improvement whatever, or for the conservation of the forests, or for any other purpose for which the same may be needed or required by the government of the United States. The evidence of title to such land shall be recorded as in other cases.

"Any county, magisterial district or municipality, whether incorporated under general law or special act of the legislature, shall have power to pay for any such tract or parcel of land and present the same to the government of the United States free of cost, for any of the purposes aforesaid, and to issue bonds and levy taxes for the purpose of paying for the same; and, in the case of a municipal corporation, the land so purchased and presented may be within the

acquisition by the United States, or under its authority, by purchase, lease, condemnation, or otherwise, of any land acquired, or to be acquired in this State by the United States, from any individual, body politic or corporate, for sites for . . . locks, dams, . . . or any needful buildings or structures or proving grounds, or works for the improvement of the navigation of any watercourse . . . or for any other purpose for which the same may be needed or required by the government of the United States." By the second paragraph provision is made for gifts by municipalities to the United States of land for any of the purposes described in the first paragraph. The third paragraph cedes to the United States "concurrent jurisdiction with this State in and over any land so acquired . . . for all purposes." The jurisdiction so ceded is to continue only during the ownership of the United States and is to cease if the United States

---

corporate limits of such municipality or within five miles thereof: *Provided, however,* That no such county, magisterial district or municipality shall, by the issue and sale of such bonds, cause the aggregate of its debt to exceed the limit fixed by the Constitution of this State: *Provided, further,* That the provisions of the Constitution and statutes of this State, or of the special act creating any municipality, relating to submitting the question of the issuing of bonds and all questions connected with the same to a vote of the people, shall, in all respects, be observed and complied with.

"Concurrent jurisdiction with this State in and over any land so acquired by the United States shall be, and the same is hereby, ceded to the United States for all purposes; but the jurisdiction so ceded shall continue no longer than the United States shall be the owner of such lands, and if the purposes of any grant to the United States shall cease, or the United States shall for five consecutive years fail to use any such land for the purposes of the grant, the jurisdiction hereby ceded over the same shall cease and determine, and the right and title thereto shall reinvest in this State. The jurisdiction ceded shall not vest until the United States shall acquire title of record to such land. Jurisdiction heretofore ceded to the United States over any land within this State by any previous acts of the legislature shall continue according to the terms of the respective cessions."

fails for five consecutive years to use any such land for the purposes of the grant.

By a further provision in § 4 [5] the State reserves the right to execute process within the limits of the land acquired "and such other jurisdiction and authority over the same as is not inconsistent with the jurisdiction ceded to the United States by virtue of such acquisition."

The contention is made that the third paragraph of § 3 as to "concurrent jurisdiction" was not in the Code of 1923, but was a later addition (1931), and should not be taken as qualifying the first paragraph. But the third paragraph was added before the acquisition here in question and "any land so acquired" manifestly refers to the acquisitions previously described which expressly embraced all such acquisitions in the future. The suggestion that the third paragraph applies only to the lands given by municipalities to the United States under the second paragraph is without force. The third paragraph appears to have been taken from the provision, in the same language, of § 19 of the Code of Virginia of 1919 which was not qualified by any intervening provision as to municipalities. See Code of West Virginia, 1931, c. 1, Art. 1, § 3, Revisers' Note. The revisers say it was added to "make more definite the provisions as to jurisdiction." *Id.* We are not referred to any decision of the Supreme Court of West Virginia construing this paragraph.

Reference is also made to the provision of § 4 as to service of process. This is said to be unnecessary if only concurrent jurisdiction is granted. But this provision

---

[5] "Sec. 4. *Execution of Process and Other Jurisdiction as to Land Acquired by United States.*—The State of West Virginia reserves the right to execute process, civil or criminal, within the limits of any lot or parcel of land heretofore or hereafter acquired by the United States as aforesaid, and such other jurisdiction and authority over the same as is not inconsistent with the jurisdiction ceded to the. United States by virtue of such acquisition."

was a part of the former statute (1923) and cannot be taken as derogating from the force of the explicit amendment by the later addition in the third paragraph of the present § 3. And apparently to prevent misunderstanding, there was an amendment at the same time of the provision now in § 4 by the addition of the last clause [6] in order to make the reservation of the State's jurisdiction "more comprehensive." Code of West Virginia, 1931, c. 1, Art. 1, § 4, Revisers' Note.

The third paragraph of § 3 carefully defines the jurisdiction ceded by the State and there is no permissible construction which would ignore this definite expression of intention in considering the effect upon jurisdiction of the consent given by the first paragraph.

But it is urged that if the paragraph be construed as seeking to qualify the consent of the State, it must be treated as inoperative. That is, that the State cannot qualify its consent, which must be taken as carrying with it exclusive jurisdiction by virtue of Clause 17. The point was suggested by Justice Story in *United States* v. *Cornell*, Fed. Cas. No. 14,867; 2 Mason 60, 65, 66, but the construction placed upon the consent in that case made decision of the point unnecessary. There the place (Fort Adams in Newport Harbor) had been purchased with the consent of the State, to which was added a reservation for the service of civil and criminal process. Justice Story held that such a reservation was not incompatible with a cession of exclusive jurisdiction to the United States, as the reservation operated "only as a condition" and "as an agreement of the new sovereign to permit its free exercise as *quoad hoc* his own process." Reservations of that sort were found to be frequent in grants made by the States to the United States in order to avoid the granted places being made a sanctuary for fugitives from justice.

---

[6] See note 5.

Story on the Constitution, Vol. 2, § 1225. Reference is made to statements in the general discussion in the opinion in *Fort Leavenworth R. Co.* v. *Lowe, supra,* but these are not decisive of the present question. The decision in that case was that the State retained its jurisdiction to tax the property of a railroad company within the Fort Leavenworth Military Reservation, as federal jurisdiction had not been reserved when Kansas was admitted as a State and, when the State subsequently ceded jurisdiction to the United States, there was saved to the State the right "to tax railroad, bridge, and other corporations, their franchises and property, on said Reservation." The terms of the cession in this respect governed the extent of the federal jurisdiction. See *Surplus Trading Co.* v. *Cook, supra.* There are *obiter dicta* in other cases but the point now raised does not appear to have been definitely determined.

It is not questioned that the State may refuse its consent and retain jurisdiction consistent with the governmental purposes for which the property was acquired The right of eminent domain inheres in the Federal Government by virtue of its sovereignty and thus it may, regardless of the wishes either of the owners or of the States, acquire the lands which it needs within their borders. *Kohl* v. *United States,* 91 U. S. 367, 371, 372. In that event, as in cases of acquisition by purchase without consent of the State, jurisdiction is dependent upon cession by the State and the State may qualify its cession by reservations not inconsistent with the governmental uses. Story on the Constitution, Vol. 2, § 1227; *Kohl* v. *United States, supra,* p. 374; *Fort Leavenworth R. Co.* v. *Lowe, supra; Surplus Trading Co.* v. *Cook, supra; United States* v. *Unzeuta, supra.* The result to the Federal Government is the same whether consent is refused and cession is qualified by a reservation of concurrent jurisdiction, or consent to the acquisition is granted with a like

qualification.  As the Solicitor General has pointed out, a transfer of legislative jurisdiction carries with it not only benefits but obligations, and it may be highly desirable, in the interest both of the national government and of the State, that the latter should not be entirely ousted of its jurisdiction.  The possible importance of reserving to the State jurisdiction for local purposes which involve no interference with the performance of governmental functions is becoming more and more clear as the activities of the Government expand and large areas within the States are acquired.  There appears to be no reason why the United States should be compelled to accept exclusive jurisdiction or the State be compelled to grant it in giving its consent to purchases.

Normally, where governmental consent is essential, the consent may be granted upon terms appropriate to the subject and transgressing no constitutional limitation.  Thus, as a State may not be sued without its consent and "permission is altogether voluntary," it follows "that it may prescribe the terms and conditions on which it consents to be sued."  *Beers* v. *Arkansas,* 20 How. 527, 529; *Smith* v. *Reeves,* 178 U. S. 436, 441, 442.  Treaties of the United States are to be made with the advice and consent of the Senate, but it is familiar practice for the Senate to accompany the exercise of this authority with reservations.  Hyde, International Law, Vol. 2, § 519.  The Constitution provides that no State without the consent of Congress shall enter into a compact with another State. It can hardly be doubted that in giving consent Congress may impose conditions.  See *Arizona* v. *California,* 292 U. S. 341, 345.

Clause 17 contains no express stipulation that the consent of the State must be without reservations.  We think that such a stipulation should not be implied.  We are unable to reconcile such an implication with the freedom of the State and its admitted authority to refuse

or qualify cessions of jurisdiction when purchases have been made without consent or property has been acquired by condemnation. In the present case the reservation by West Virginia of concurrent jurisdiction did not operate to deprive the United States of the enjoyment of the property for the purposes for which it was acquired, and we are of the opinion that the reservation was applicable and effective.

(c) *As to property leased by respondent and used for the accommodation of its equipment.* There can be no question as to the jurisdiction of the State over this area.

We conclude that, so far as territorial jurisdiction is concerned, the State had authority to lay the tax with respect to the respondent's activities carried on at the respective dam sites.

*Second.* Is the tax invalid upon the ground that it lays a direct burden upon the Federal Government? The Solicitor General speaking for the Government supports the contention of the State that the tax is valid. Respondent urges the contrary.

The tax is not laid upon the Government, its property or officers. *Dobbins* v. *Commissioners,* 16 Pet. 435, 449, 450.

The tax is not laid upon an instrumentality of the Government. *McCulloch* v. *Maryland,* 4 Wheat. 316; *Osborn* v. *Bank of the United States,* 9 Wheat. 738; *Gillespie* v. *Oklahoma,* 257 U. S. 501; *Federal Land Bank* v. *Crosland,* 261 U. S. 374; *Clallam County* v. *United States,* 263 U. S. 341; *New York ex rel. Rogers* v. *Graves,* 299 U. S. 401. Respondent is an independent contractor. The tax is non-discriminatory.

The tax is not laid upon the contract of the Government. *Osborn* v. *Bank of the United States, supra,* p. 867; *Weston* v. *Charleston,* 2 Pet. 449, 468, 475; *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S. 429, 581, 582, 586; *Telegraph Company* v. *Texas,* 105 U. S. 460, 464, 466;

*Leloup* v. *Port of Mobile,* 127 U. S. 640, 646; *Williams* v. *Talladega,* 226 U. S. 404, 418, 419; *Federal Land Bank* v. *Crosland, supra; Willcuts* v. *Bunn,* 282 U. S. 216; *Panhandle Oil Co.* v. *Mississippi ex rel. Knox,* 277 U. S. 218, 222; *Indian Motocycle Co.* v. *United States,* 283 U. S. 570, 574; *Graves* v. *Texas Company,* 298 U. S. 393, 401. The application of the principle which denies validity to such a tax has required the observing of close distinctions in order to maintain the essential freedom of government in performing its functions, without unduly limiting the taxing power which is equally essential to both Nation and State under our dual system. In *Weston* v. *Charleston, supra,* and *Pollock* v. *Farmers' Loan & Trust Co., supra,* taxes on interest from government securities were held to be laid on the government's contract—upon the power to borrow money—and hence were invalid. But we held in *Willcuts* v. *Bunn, supra,* that the immunity from taxation does not extend to the profits derived by their owners upon the sale of government bonds. We said (*Id.,* p. 225): "The power to tax is no less essential than the power to borrow money, and, in preserving the latter, it is not necessary to cripple the former by extending the constitutional exemption from taxation to those subjects which fall within the general application of non-discriminatory laws, and where no direct burden is laid upon the governmental instrumentality, and there is only a remote, if any, influence upon the exercise of the functions of government." Many illustrations were given.

In *Telegraph Company* v. *Texas, supra,* a specific state tax was imposed on each message sent by an officer of the United States on public business over the lines of the Telegraph Company. In holding the tax to be invalid the Court leaned heavily upon the fact that the Company had accepted the terms of the Act of Congress of 1866 (14 Stat. 221) authorizing the use of the military and

post roads and requiring in return that government messages have priority over all other business and be transmitted at rates fixed annually by the Postmaster General. The Court considered that the Company had thus become an agent of the Government for the transmission of messages on public business. See to the same effect *Leloup* v. *Port of Mobile, supra.* The same point was taken in *Williams* v. *Talladega, supra,* involving a local license fee applicable to the same Telegraph Company. The Court said that the tax was laid upon "the privilege of carrying on a business a part of which is that of a governmental agency constituted under a law of the United States and engaged in an essential part of the public business—communication between the officers and departments of the Federal Government." The emphasis put in these cases upon the effect of the acceptance of the obligation of the Act of Congress shows that they cannot be regarded as sustaining the broad claim of immunity here advanced.

In *Panhandle Oil Co.* v. *Mississippi ex rel. Knox, supra,* and *Indian Motocycle Co.* v. *United States, supra,* the taxes were held to be invalid as laid on the sales to the respective governments, the one being a state tax on a sale to the United States, and the other a federal tax on the sale to a municipal corporation of Massachusetts. A similar result was reached in *Graves* v. *Texas Company, supra.* These cases have been distinguished and must be deemed to be limited to their particular facts. Thus, in *Wheeler Lumber Co.* v. *United States,* 281 U. S. 572, 579, the federal tax on transportation as applied to lumber which the vendor had engaged to sell to a county for public bridges and to deliver f. o. b. at the place of destination at a stated price, was held to be laid not on the sale but on the transportation. Although the transportation was with a view to a definite sale, it was held to be not part of the sale but preliminary to it and

"wholly the vendor's affair." In *Liggett & Myers Co.* v. *United States,* 299 U. S. 383, 386, the federal tax as applied to tobacco purchased by a State for use in a state hospital was sustained as a tax upon the manufacture of the tobacco and not upon the sale. Hence, the Court said, "the effect upon the purchaser was indirect and imposed no prohibited burden."

In *Alward* v. *Johnson,* 282 U. S. 509, 514, the Court sustained a state tax upon the gross receipts of an independent contractor carrying the mails. The taxpayer operated an automotive stage line. Two-thirds of his gross receipts, upon the whole of which he was taxed, were derived from carriage of United States mails and the remainder from carriage of passengers and freight. The Court found that the property used in earning these receipts was devoted chiefly to carrying the mails and that without his contract with the Government the stage line could not be operated profitably. In upholding the tax upon his gross receipts we distinguished *Panhandle Oil Co.* v. *Mississippi ex rel. Knox, supra,* saying: "There was no tax upon the contract for such carriage; the burden laid upon the property employed affected operations of the Federal Government only remotely . . . The facts in *Panhandle Oil Co.* v. *Mississippi ex rel. Knox,* 277 U. S. 218, and *New Jersey Bell Tel. Co.* v. *State Board,* 280 U. S. 338, were held to establish direct interference with or burden upon the exercise of a Federal right. The principles there applied are not controlling here."

These decisions show clearly the effort of the Court in this difficult field to apply the practical criterion to which we referred in *Willcuts* v. *Bunn, supra,* and again in *Graves* v. *Texas Company, supra.* There is no ineluctable logic which makes the doctrine of immunity with respect to government bonds applicable to the earnings of an independent contractor rendering services to the Gov-

ernment. That doctrine recognizes the direct effect of a tax which "would operate on the power to borrow before it is exercised" (*Pollock* v. *Farmers' Loan & Trust Co.*, *supra*) and which would directly affect the Government's obligation as a continuing security. Vital considerations are there involved respecting the permanent relations of the Government to investors in its securities and its ability to maintain its credit,—considerations which are not found in connection with contracts made from time to time for the services of independent contractors. And in dealing with the question of the taxability of such contractors upon the fruits of their work, we are not bound to consider or decide how far immunity from taxation is to be deemed essential to the protection of Government in relation to its purchases of commodities or whether the doctrine announced in the cases of that character which we have cited deserves revision or restriction.

The question of the taxability of a contractor upon the fruits of his services is closely analogous to that of the taxability of the property of the contractor which is used in performing the services. His earnings flow from his work; his property is employed in securing them. In both cases, the taxes increase the cost of the work and diminish his profits. Many years ago the Court recognized and enforced the distinction between a tax laid directly upon a government contract or an instrumentality of the United States and a tax upon the property employed by an agent or contractor in performing services for the United States. "Taxation of the agency is taxation of the means; taxation of the property of the agent is not always, or generally, taxation of the means." *Thomson* v. *Pacific Railroad,* 9 Wall. 579, 591. In expounding the grounds for the conclusion that the property of the contractor was taxable, the Court envisaged the serious consequences which would follow if immunity

154

were maintained. In *Railroad Company* v. *Peniston,* 18 Wall. 5, 33, 36, the Court said:

"It may, therefore, be considered as settled that no constitutional implications prohibit a State tax upon the property of an agent of the government merely because it is the property of such an agent. A contrary doctrine would greatly embarrass the States in the collection of their necessary revenue without any corresponding advantage to the United States. A very large proportion of the property within the States is employed in execution of the powers of the government. It belongs to governmental agents, and it is not only used, but it is necessary for their agencies. United States mails, troops, and munitions of war are carried upon almost every railroad. Telegraph lines are employed in the National service. So are steamboats, horses, stage-coaches, foundries, shipyards, and multitudes of manufacturing establishments. They are the property of natural persons, or of corporations, who are instruments or agents of the General government, and they are the hands by which the objects of the government are attained. Were they exempt from liability to contribute to the revenue of the States it is manifest the State governments would be paralyzed. While it is of the utmost importance that all the powers vested by the Constitution of the United States in the General government should be preserved in full efficiency, and while recent events have called for the most unembarrassed exercise of many of those powers, it has never been decided that State taxation of such property is impliedly prohibited. . . .

"It is, therefore, manifest that exemption of Federal agencies from State taxation is dependent, not upon the nature of the agents, or upon the mode of their constitution, or upon the fact that they are agents, but upon the effect of the tax; that is, upon the question whether the tax does in truth deprive them of power to serve the

government as they were intended to serve it, or does hinder the efficient exercise of their power. A tax upon their property has no such necessary effect. It leaves them free to discharge the duties they have undertaken to perform. A tax upon their operations is a direct obstruction to the exercise of Federal power."

The dissenting opinion of Justice Bradley (with whom Justice Field concurred) while considering that the state tax was invalid as applied to property of the Union Pacific Railroad because of its special relation to the Government which had chartered it, emphasized the distinction between such a situation as he conceived it and one where the Government has entered into a contract for services to aid in the discharge of governmental functions. His observations are strikingly pertinent here (*id.* pp. 41, 42):

"The case differs *toto cœlo* from that wherein the government enters into a contract with an individual or corporation to perform services necessary for carrying on the functions of government—as for carrying the mails, or troops, or supplies, or for building ships or works for government use. In those cases the government has no further concern with the contractor than in his contract and its execution. It has no concern with his property or his faculties independent of that. How much he may be taxed by, or what duties he may be obliged to perform towards, his State is of no consequence to the government, so long as his contract and its execution are not interfered with. In that case the contract is the means employed for carrying into execution the powers of the government, and the contract alone, and not the contractor, is exempt from taxation or other interference by the State government."

The question of immunity from taxation of the earnings of an independent contractor under a government contract arose in *Metcalf & Eddy* v. *Mitchell*, 269 U. S.

514. The services were rendered to a political subdivison of a State and the contractors' earnings were held to be subject to the federal income tax. That was a pivotal decision, for we had to meet the question whether the earnings of the contractor stood upon the same footing as interest upon government securities or the income of an instrumentality of government. It is true that the tax was laid upon net income. But if the tax upon the earnings of the contractor had been regarded as imposing a direct burden upon a governmental agency, the fact that the tax was laid upon net income would not save it under the doctrine of *Gillespie* v. *Oklahoma, supra.* And if the doctrine of the immunity of interest upon government bonds had been deemed to apply, the tax would have been equally bad whether the tax was upon net or gross income. The ruling in *Pollock* v. *Farmers' Loan & Trust Co., supra,* related to net income. The uniform ruling in such a case has been that the interest upon government securities cannot be included in gross income for the purpose of an income tax computed upon net income. The pith of the decision in the case of *Metcalf & Eddy* is that government bonds and contracts for the services of an independent contractor are not upon the same footing. The decision was a definite refusal to extend the doctrine of cases relating to government securities, and to the instrumentalities of government, to earnings under contracts for labor.

The reasoning upon which that decision was based is controlling here. We recognized that in a broad sense "the burden of federal taxation necessarily sets an economic limit to the practical operation of the taxing power of the states, and *vice versa.*" "Taxation by either the state or the federal government affects in some measure the cost of operation of the other." As "neither government may destroy the other nor curtail in any substantial manner the exercise of its powers," we said that the limi-

tation upon the taxing power of each, so far as it affects the other, "must receive a practical construction which permits both to function with the minimum of interference each with the other; and that limitation cannot be so varied or extended as seriously to impair either the taxing power of the government imposing the tax . . . or the appropriate exercise of the functions of the government affected by it." *Metcalf & Eddy* v. *Mitchell, supra,* pp. 523, 524.

We said further that the nature of the governmental agencies or the mode of their constitution could not be disregarded in passing on the question of tax exemption, as it was obvious that an agency might be of such a character or so intimately connected with the exercise of a power or the performance of a duty by the one government "that any taxation of it by the other would be such a direct interference with the functions of government itself as to be plainly beyond the taxing power." And it was on that principle that "any taxation by one government of the salary of an officer of the other, or the public securities of the other, or an agency created and controlled by the other, exclusively to enable it to perform a governmental function," was prohibited. We concluded that a non-discriminatory tax upon the earnings of an independent contractor derived from services rendered to the Government could not be said to be imposed "upon an agency of government in any technical sense" and could not "be deemed to be an interference with government, or an impairment of the efficiency of its agencies in any substantial way." *Id.,* pp. 524, 525.

While the *Metcalf* case was one of a federal tax, the reasoning and the practical criterion it adopts are clearly applicable to the case of a state tax upon earnings under a contract with the Federal Government.

As we have observed, the fact that the tax in the present case is laid upon the gross receipts, instead of

net earnings, is not a controlling distinction. Respondent invokes our decisions in the field of interstate commerce, where a tax upon the gross income of the taxpayer derived from interstate commerce has long been held to be an unconstitutional burden. *Philadelphia & Southern S. S. Co.* v. *Pennsylvania,* 122 U. S. 326; *Crew Levick Co.* v. *Pennsylvania,* 245 U. S. 292, 297; *United States Glue Co.* v. *Oak Creek,* 247 U. S. 321, 328, 329; *Fisher's Blend Station* v. *Tax Commission,* 297 U. S. 650, 655, 656.

But the difference is plain. Persons have a constitutional right to engage in interstate commerce free from burdens imposed by a state tax upon the business which constitutes such commerce or the privilege of engaging in it or the receipts as such derived from it. *Minnesota Rate Cases,* 230 U. S. 352, 400. Interstate commerce is not an abstraction; it connotes the transactions of those engaged in it and they enjoy the described immunity in their own right. Here, respondent's activities at the dam sites are local and not in interstate commerce. Respondent has no constitutional right to immunity from nondiscriminatory local taxation and the mere fact that the tax in question burdens respondent is no defense. The defense is that the tax burdens the Government and respondent's right is at best a derivative one. He asserts an immunity which, if it exists, pertains to the Government and which the Government disclaims.

In *Alward* v. *Johnson, supra,* as already noted, the tax was upon gross receipts and these were derived from a contract for carrying the mails, but the tax was upheld. It there appeared that the tax was in lieu of taxes upon the property and had been treated by the state court as a property tax. But if the tax as actually laid upon the gross receipts placed a direct burden upon the Federal Government so as to interfere with the performance of its functions, it could not be saved because it was in lieu of a tax upon property or was so characterized. See

*Hanover Insurance Co.* v. *Harding,* 272 U. S. 494, 509, 510.

In *Fidelity & Deposit Co.* v. *Pennsylvania,* 240 U. S. 319, we sustained the tax upon the gross premiums received by a company as surety upon bonds running to the United States for "internal revenue, customs, United States government officials, United States government contracts and banks for United States deposits," and "bonds given in courts of the United States in litigation there pending." While the challenged tax was "an exaction for the privilege of doing business," we held it to be valid as "mere contracts between private corporations and the United States do not necessarily render the former essential governmental agencies and confer freedom from state control." *Id.,* pp. 320, 323. The premiums, of course, were paid by those who were required to obtain the bonds, but the fact that the contracts were with the United States and that the tax was laid upon gross receipts from the writing of such contracts, did not make the tax an invalid exaction.

In both the *Alward* case and that of the *Fidelity & Deposit Company,* the argument, pressed here, that the State withheld for its use "a part of every dollar" received by the taxpayer, was equally pertinent and equally unavailing.

The contention ultimately rests upon the point that the tax increases the cost to the Government of the service rendered by the taxpayer. But this is not necessarily so. The contractor, taking into consideration the state of the competitive market for the service, may be willing to bear the tax and absorb it in his estimated profit rather than lose the contract. In the present case, it is stipulated that respondent's estimated cost of the respective works, and the bids based thereon, did not include, and there was not included in the contract price paid to respondent, any specified item to cover the gross receipts

tax, although respondent knew of the West Virginia act imposing it, and respondent's estimates of cost did include "compensation and liability insurance, construction bond and property taxes."

But if it be assumed that the gross receipts tax may increase the cost to the Government, that fact would not invalidate the tax. With respect to that effect, a tax on the contractor's gross receipts would not differ from a tax on the contractor's property and equipment necessarily used in the performance of the contract. Concededly, such a tax may validly be laid. Property taxes are naturally, as in this case, reckoned as a part of the expense of doing the work. Taxes may validly be laid not only on the contractor's machinery but on the fuel used to operate it. In *Trinityfarm Construction Co.* v. *Grosjean,* 291 U. S. 466, the taxpayer entered into a contract with the Federal Government for the construction of levees in aid of navigation and gasoline was used to supply power for taxpayer's machinery. A state excise tax on the gasoline so used was sustained. The Court said that if the payment of the state taxes imposed on the property and operations of the taxpayer "affects the federal government at all, it at most gives rise to a burden which is consequential and remote and not to one that is necessary, immediate or direct." But a tax of that sort unquestionably increases the expense of the contractor in performing his service and may, if it enters into the contractor's estimate, increase the cost to the Government. The fact that the tax on the gross receipts of the contractor in the *Alward* case, *supra,* might have increased the cost to the Government of the carriage of the mails did not impress the Court as militating against its validity.

There is the further suggestion that if the present tax of two per cent. is upheld, the State may lay a tax of twenty per cent. or fifty per cent. or even more, and make it difficult or impossible for the Government to obtain

the service it needs. The argument ignores the power of Congress to protect the performance of the functions of the National Government and to prevent interference therewith through any attempted state action. In *Thomson v. Pacific Railroad, supra,* the Court pointedly referred to the authority of Congress to prevent such an interference through the use of the taxing power of the State. "It cannot," said the Court, "be so used, indeed, as to defeat or hinder the operations of the National government; but it will be safe to conclude, in general, in reference to persons and State corporations employed in government service, that when Congress has not interposed to protect their property from State taxation, such taxation is not obnoxious to that objection." See *Van Allen v. Assessors,* 3 Wall. 573, 585; *Fidelity & Deposit Co. v. Pennsylvania, supra.*

We hold that the West Virginia tax so far as it is laid upon the gross receipts of respondent derived from its activities within the borders of the State does not interfere in any substantial way with the performance of federal functions and is a valid exaction. The decree of the District Court is reversed and the cause is remanded for further proceedings in conformity with this opinion.

*Reversed.*

MR. JUSTICE ROBERTS, dissenting.

I regret that I am unable to concur in the Court's opinion. I should not set forth my views in detail were I not convinced the decision runs counter to the settled rule that a State may not, by taxation, burden or impede the United States in the exercise of its delegated powers. The judgment seems to me to overrule, *sub silentio,* a century of precedents, and to leave the application of the rule uncertain and unpredictable.

The doctrine which forbids a state to interfere with the exercise of federal powers does not have its origin in the

common law exemption of the sovereign from regulation or taxation. It springs from the necessity of maintaining our dual system of government.[1] "The attempt to use it [the power of taxation] on the means employed by the government of the Union, in pursuance of the constitution, is itself an abuse, because it is the usurpation of a power which the people of a single State cannot give. We find, then, on just theory, a total failure of this original right [of the states] to tax the means employed by the government of the Union, for the execution of its powers."[2] "The immunity is derived from the Constitution in the same sense and upon the same principle that it would be if expressed in so many words."[3]

This immunity was defined by Chief Justice Marshall in *M'Culloch* v. *Maryland,* 4 Wheat. 316, 436:

" . . . the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government."

In its application the principle forbids taxation by a state of property of the federal government,[4] or of the office or salary of any of its officers.[5]

---

[1] *Indian Motocycle Co.* v. *United States,* 283 U. S. 570, 575; *Board of Trustees* v. *United States,* 289 U. S. 48, 59; *Helvering* v. *Powers,* 293 U. S. 214, 225.

[2] *M'Culloch* v. *Maryland,* 4 Wheat. 316, 430; *Weston* v. *Charleston,* 2 Pet. 449, 467.

[3] *Clallam County* v. *United States,* 263 U. S. 341, 344.

[4] *McGoon* v. *Scales,* 9 Wall. 23, 27; *Tucker* v. *Ferguson,* 22 Wall. 527, 572; *Van Brocklin* v. *Tennessee,* 117 U. S. 151; *Wisconsin Central R. Co.* v. *Price County,* 133 U. S. 496, 504; *Irwin* v. *Wright,* 258 U. S. 219, 228. But property acquired from the Government, upon its severance, loses the immunity in the hands of the transferee. *Forbes* v. *Gracey,* 94 U. S. 762; *Group No. 1 Oil Corp.* v. *Bass,* 283 U. S. 279; *Indian Territory Oil Co.* v. *Board,* 288 U. S. 325.

[5] *Dobbins* v. *Commissioners,* 16 Pet. 435; *Collector* v. *Day,* 11 Wall. 113. But the exemption does not extend to taxes laid upon his pri-

I agree that the gross receipts tax laid by West Virginia upon the appellee's transactions with the United States is not upon the government as such, upon its property or upon its officers.

The government need not perform all its functions by the use of its property and the activity of its officers, but may establish agencies to these ends. Such an agency, created not for private gain but wholly devoted to governmental purposes and wholly owned by the United States, is as free from state taxation on its property and its activities as the government itself; and the exemption extends to the salaries of its officers.[6] In the exertion of the powers conferred upon it by the Constitution, the United States may, in its discretion, erect corporations for private gain and employ them as its instrumentalities.[7] No tax can be laid upon their franchises or operations,[8] but their local property[9] is subject to non-discriminating state taxation. In contrast, the bestowal of benefits, rights, privileges, or immunities or the imposition of duties by federal law upon a natural person or a corporation does not convert him or it into a federal agency exempt from uniform state excise or

vately owned property or a sales tax on his personal purchases, even though they be of articles he uses in connection with his performance of his government work. *Dyer* v. *City of Melrose*, 215 U. S. 594; *Tirrell* v. *Johnston*, 293 U. S. 533; 86 N. H. 530.

[6] *Clallam County* v. *United States*, 263 U. S. 341; *New Brunswick* v. *United States*, 276 U. S. 547; *New York ex rel. Rogers* v. *Graves*, 299 U. S. 401. For the same reason a state tax which burdens the fiscal operations of a territory must fall: *Farmers & Mechanics Savings Bank* v. *Minnesota*, 232 U. S. 516.

[7] Interstate railroad: *Railroad Company* v. *Peniston*, 18 Wall. 5. National banks: *M'Culloch* v. *Maryland*, 4 Wheat. 316; *Smith* v. *Kansas City Title & T. Co.*, 255 U. S. 180.

[8] *Osborn* v. *Bank*, 9 Wheat. 738; *Railroad Company* v. *Peniston*, 18 Wall. 5; *Owensboro National Bank* v. *Owensboro*, 173 U. S. 664.

[9] *Railroad Company* v. *Peniston*, 18 Wall. 5; *Indian Territory Oil Co.* v. *Board*, 288 U. S. 325, 327, 328.

property taxes.[10]  Where the United States, by contract, constitutes a person or corporation its agent to fulfil a governmental obligation, a state tax upon such an agent is forbidden if it falls upon the avails of the operation in which the government has an interest, or is an excise or privilege tax upon the agent's operations; [11] but a general and uniform state property tax which falls only upon the agent's property used in the performance of the contract is valid.[12]  The opinion of the court adverts to these distinctions, but, since admittedly the appellee is not an agency or instrumentality of the United States, a discussion of taxes laid upon the operations as contrasted with those imposed upon the property of such an agency or instrumentality is beside the point upon which the case turns.[13]

I agree that the challenged tax is not, in terms, laid upon the contract of the government, but I am of opinion that it directly burdens and impedes the operations of the United States within the reason and scope of the principle of immunity and according to the application of that principle in numerous decisions of the court.  If this be so, the facts that the exaction is not in terms upon the contract with the government, that the appellee

---

[10] *Thomson* v. *Pacific Railroad,* 9 Wall. 579; *Western Union Tel. Co.* v. *Massachusetts,* 125 U. S. 530; *Massachusetts* v. *Western Union Tel. Co.,* 141 U. S. 40; *Baltimore Shipbuilding Co.* v. *Baltimore,* 195 U. S. 375; *Fidelity & Deposit Co.* v. *Pennsylvania,* 240 U. S. 319; *Choctaw, O. & G. R. Co.* v. *Mackey,* 256 U. S. 531; *Susquehanna Power Co.* v: *Tax Commission,* 283 U. S. 291; *Broad River Power Co.* v. *Query,* 288 U. S. 178; *Federal Compress Co.* v. *McLean,* 291 U. S. 17.

[11] *Choctaw & Gulf R. Co.* v. *Harrison,* 235 U. S. 292; *Gillespie* v. *Oklahoma,* 257 U. S. 501; *Jaybird Mining Co.* v. *Weir,* 271 U. S. 609.

[12] *Indian Territory Oil Co.* v. *Board,* 288 U. S. 325; *Taber* v. *Indian Territory Oil Co.,* 300 U. S. 1.

[13] The Solicitor General's argument, noticed later, would, however, validate a tax of any description imposed upon federal instrumentalities, provided the exaction were non-discriminatory.

is an independent contractor, that the tax is non-discriminatory, or that it is not excessive in amount cannot serve to exculpate the statute from the charge that it transgresses the rule. These considerations, as repeatedly held, are irrelevant where the tax falls directly, immediately, and palpably upon an operation of the federal government or a means chosen for the exercise of its powers. Many illustrations are available of exactions which plainly burden and impede in some degree the lawful operations of the United States. As the opinion of the court indicates, a tax in terms laid upon the contract would do so,—such as an excise for the privilege of making the contract or performing it,[14] a stamp tax upon the documents evidencing the contract, or a requirement that the contract be recorded and a tax be paid upon its recordation.[15]

The court has, moreover, repeatedly held a tax nominally upon one who contracts with the government was in effect and in fact imposed upon the operations of the latter. Thus an excise upon a telegraph company which, under contract with the United States, transmits government messages, whether the tax be at a given sum per message [16] or in the form of a license tax upon all business, private and governmental,[17] is prohibited because it imposes a burden upon the operations of the United States. The cases so holding are sought to be distinguished by the circumstance that the telegraph companies carrying the messages of the United States were by federal statute given the privilege of using the post roads; and it is said that this in some way gave them a peculiar status which rendered their gross receipts un-

---

[14] *Osborn* v. *Bank*, 9 Wheat. 738, 867.

[15] *Federal Land Bank* v. *Crosland*, 261 U. S. 374.

[16] *Telegraph Co.* v. *Texas*, 105 U. S. 460.

[17] *Leloup* v. *Port of Mobile*, 127 U. S. 640; *Williams* v. *Talladega*, 226 U. S. 404.

taxable. But that was not the basis of decision. The ground of immunity was that the tax was in effect on the government's transactions in the exertion of its lawful powers. Thus in *Telegraph Co.* v. *Texas,* 105 U. S. at p. 465, it was said "The tax is the same on every message sent, and because it is sent, . . . Clearly if a fixed tax for every two thousand pounds of freight carried is a tax on the freight, or for every measured ton of a vessel a tax on tonnage, or for every passenger carried a tax on the passenger, or for the sale of goods a tax on the goods, this must be a tax on the messages. . . . As to the government messages, it is a tax by the State on the means employed by the government of the United States to execute its constitutional powers, and, therefore, void. It was so decided in *McCulloch* v. *Maryland,* (4 Wheat. 316) and has never been doubted since."

That the privileges granted telegraph companies by federal law, had no bearing upon the validity of the tax is shown by *Western Union Telegraph Co.* v. *Massachusetts,* 125 U. S. 530 and *Massachusetts* v. *Western Union Telegraph Co.,* 141 U. S. 40, in which state taxes on the property and franchises of companies, operating under the same statute as the Telegraph Company in the *Texas* case were sustained because not on the transactions between the carrier and the United States.

Stock issued by the United States evidencing indebtedness to the holder cannot be taxed *ad valorem* by a state.[18] A tax upon the assets of a corporation is bad if obligations of the United States are included in the assessment.[19] A gross income tax is invalid to the extent

---

[18] *Weston* v. *Charleston,* 2 Pet. 449, 465.

[19] *Bank of Commerce* v. *New York City,* 2 Black 620; *Bank Tax Case,* 2 Wall. 200; *Bank* v. *Supervisors,* 7 Wall. 26; *Home Savings Bank* v. *Des Moines,* 205 U. S. 503; *Missouri* v. *Gehner,* 281 U. S. 313.

that it is laid on income from federal securities.[20] The reason is that "the tax . . . is a tax upon the contract subsisting between the government and the individual. It bears directly upon that contract, while subsisting and in full force. The power operates upon the contract the instant it is framed, and must imply a right to affect that contract." The government's obligation is for the payment both of principal and interest, and an exaction which bears upon either of these features of the obligation is prohibited.

Certificates of indebtedness issued by the United States, payable at a future date, with interest, issued to creditors for supplies furnished by them to the nation, cannot be taxed by a state. They differ from the gross receipts here taxed only in the respect that they were issued to secure payment of past-due contractual obligations, whereas the cash paid the appellee was in solution of a present obligation of like nature. Of the taxability of these certificates it was said: [21]

" . . . But we fail to perceive . . . that such certificates, issued as a means of executing constitutional powers of the government other than of borrowing money, are not as much beyond control and limitation by the States through taxation, as bonds or other obligations issued for loans of money."

Many sorts of imposts, however, which bear merely upon the obligee of a government contract for the exercise of a privilege having no relation to the contractual nexus between him and the government have been sus-

---

[20] *Northwestern Ins. Co.* v. *Wisconsin*, 275 U. S. 136; *National Life Ins. Co.* v. *United States*, 277 U. S. 508. And no form of words or subterfuge can save an act the intent of which is to reach the income from federal bonds. *Miller* v. *Milwaukee*, 272 U. S. 713; *Macallen Co.* v. *Massachusetts*, 279 U. S. 620, 629.

[21] *The Banks* v. *The Mayor*, 7 Wall. 16, 25.

tained. So, a franchise or privilege tax measured by assets or by income is not rendered void by the circumstance that the taxpayer's assets or income include federal securities or interest thereon.[22] And a law which imposes an excise upon the privilege of transmission of property at death may include federal securities in the estate by which the tax is measured.[23] Upon the like reasoning a tax upon moneys and credits in the assessment of which uncollected government checks are included is valid.[24]

There can be no difference in reason, or in practical effect, between taxation of government contracts to repay borrowed funds or written promises to pay for goods previously furnished and a contract to pay for goods and services as furnished, or any other form of contract whereby the government exercises its granted powers. The federal power to contract for supplies or services is as necessary and as fundamental as the power to borrow money. Thus it has been said, speaking of a tax upon government obligations: [25]

"If the states and corporations throughout the union, possess the power to tax a contract for the loan of money, what shall arrest this principle in its application to every other contract? What measure can government adopt which will not be exposed to its influence?"

If the government, as guardian of an incompetent Indian, leases land to a mining company on a royalty consisting of a percentage of the gross proceeds derived from the sale of ores mined, a state *ad valorem* tax assessed to the lessee on the ores mined and in storage upon the

---

[22] *Home Ins. Co.* v. *New York,* 119 U. S. 129; *Home Ins. Co.* v. *New York,* 134 U. S. 594.

[23] *Plummer* v. *Coler,* 178 U. S. 115; *Greiner* v. *Lewellyn,* 258 U. S. 384.

[24] *Hibernia Savings Society* v. *San Francisco,* 200 U. S. 310.

[25] *Weston* v. *Charleston,* 2 Pet. 449, 465.

leased land before any sale or segregation of the equitable interests of the government as guardian, is void as burdening and impeding an operation of the government.[26] A sales tax on commodities sold to the government, though laid upon the seller at a given rate per unit sold, is also bad as directly burdening the government's transactions.[27] A tax on storage or withdrawal from storage essential to the sale of a commodity contracted to be delivered to the United States is in the same class as a tax on sales to the government.[28] On the other hand, a sales tax upon articles purchased by a government contractor,[29] or a net income tax laid upon his income, is valid.[30] The reason is that exactions of the latter sort do not impinge upon or directly affect the transaction between him and the government; do not affect the government's choice of means for executing its powers.

While a gross income tax upon receipts derived from a government contract would in itself be bad, if the exaction is in lieu of all property taxes and intended as a property tax, measured by receipts of the property, it is valid.[31]

Over a century ago the court said:[32]

"Can a contractor for supplying a military post with provisions, be restrained from making purchases within any State, or from transporting the provisions to the place at which the troops were stationed? or could he be

---

[26] *Jaybird Mining Co.* v. *Weir*, 271 U. S. 609.

[27] *Indian Motocycle Co.* v. *United States*, 283 U. S. 570; Panhandle Oil Co. v. Mississippi ex rel. Knox, 277 U. S. 218; *Graysburg Oil Co.* v. *Texas*, 278 U. S. 582; 3 S. W. (2d) 427. Compare *Brown* v. *Maryland*, 12 Wheat. 419, 440.

[28] *Graves* v. *Texas Company*, 298 U. S. 393.

[29] *Trinityfarm Construction Co.* v. *Grosjean*, 291 U. S. 466.

[30] *General Construction Co.* v. *Fisher*, 295 U. S. 715; 149 Ore. 84; 39 P. (2d) 358; *Burnet* v. *A. T. Jergins Trust*, 288 U. S. 508.

[31] *Alward* v. *Johnson*, 282 U. S. 509.

[32] *Osborn* v. *Bank*, 9 Wheat. 738, 867.

fined or taxed for doing so? We have not yet heard these questions answered in the affirmative. It is true, that the property of the contractor may be taxed, as the property of other citizens; . . . But we do not admit that the act of purchasing, or of conveying the articles purchased, can be under State control."

There is no distinction between a sales tax on goods sold to the federal government and a gross receipts tax upon the furnishing of goods and services under a contract with the government. As was said in *Panhandle Oil Co.* v. *Mississippi ex rel. Knox,* 277 U. S. 218, 221:

"The right of the United States to make such purchases is derived from the Constitution. The petitioner's right to make sales to the United States was not given by the State and does not depend on state laws; it results from the authority of the national government under the Constitution to choose its own means and sources of supply. While Mississippi may impose charges upon petitioner for the privilege of carrying on trade that is subject to the power of the State, it may not lay any tax upon transactions by which the United States secures the things desired for its governmental purposes."

As in the *Panhandle* case, so in the present, the receipt of the thing contracted for constitutes the transaction by which the tax is measured and on which the burden rests. We may thus paraphrase what was there said: to use the value and amount of the goods and services furnished to the United States as a measure of the tax is in substance and effect to tax the transaction itself. The amount of the tax rises and falls in direct ratio to the contract value of the goods and services rendered to the government. This is to tax the sale; and that is to tax the United States.

The Solicitor General as *amicus curiae* proposes a single test of the constitutionality of a state tax upon the operations of the United States, or the means chosen for

the execution of its powers. That test is whether the taxing statute discriminates against the government and in favor of other taxpayers. He frankly admits that if the proposed criterion be adopted we must overrule *Indian Motocycle Co.* v. *United States,* 283 U. S. 570; *Panhandle Oil Co.* v. *Mississippi ex rel. Knox, supra;* and *Graves* v. *Texas Company,* 298 U. S. 393. He professes himself, as I am, unable to distinguish a sales tax or a tax upon storage preliminary to sale to the United States from a gross receipts tax upon goods and services furnished the government. In a brief filed as *amicus curiae* in *Graves* v. *Texas Company, supra,* he urged the court to hold such a tax imposed on gasoline under contract to the United States invalid as an unconstitutional impediment and burden upon the operations of the government.[33] It is said that these cases have been distinguished. But in the cases distinguished from them the tax was found to be one on the property of a contractor with the United States, or on his net income, not on the gross receipts of his contract with the government. To distinguish them from the present case is not to rely upon any principle but upon the mere name or label given to a tax. Such distinctions only serve to confuse.

I do not think the Solicitor General in brief or argument answered the question propounded by the court in the present case: whether the tax is invalid as laying a burden upon the operations of the federal government. He responds that the tax is valid in spite of the fact that it lays such a burden. Thus he states: "We have indicated that a tax upon the contractor, the sole result of which is to increase the cost to the sovereign by the

---

[33] In this brief the Solicitor General stated that figured upon the estimated purchases of the Government for the then current fiscal year, state sales taxes on gasoline of four cents per gallon, imposed by all the states, would impose an added burden upon the United States of $4,479,661.

amount of the normal tax burden, presents no interference with its operations." Again he says that the imposition of the tax in question "is in no sense a threat to the capacity of the government to perform its functions."

Thus it appears that, in his view, a non-discriminatory state tax is to be judged not by the "burden" it imposes, but by the extent of its "interference" with the functioning of government. If this be the test, no tax, however great, can prevent such functioning, so long as the United States' taxing and borrowing powers remain adequate to meet the ordinary expenses of its operations and the added cost of state taxes thereon. The adoption of any such theory would require the overruling not only of the three decisions the Solicitor General singles out for deletion, but literally scores of others, beginning with *M'Culloch* v. *Maryland* and ending with *Graves* v. *Texas Company*, 298 U. S. 393, decided at the 1935 term in accordance with the views then earnestly pressed upon us by the Solicitor General.

It is not clear to what extent the court's opinion adopts the doctrine advocated by the government. It is said merely that the appellee is an independent contractor, that the tax is non-discriminatory and is not laid upon the contract of the government; and it is suggested that if in the view of Congress the burden of such a tax becomes too heavy, Congress has the means of redress. Whether one or all of these factors is requisite to justify the exaction we are not told.

The cases on which the opinion especially relies do not justify sustaining this tax. *Metcalf & Eddy* v. *Mitchell*, 269 U. S. 514, throws no light upon the problem presented. A contractor employed to advise a state and its municipal subdivisions sought exemption from a federal tax upon net income. The law imposing the tax did not discriminate against the receipts from the contract but treated them as part of the gross income upon which

the taxable net income was to be calculated. In accordance with all of this court's applicable decisions the tax was held not to be upon the state or its contract with the taxpayer, not upon an instrumentality or means chosen by the state for executing its powers, not directly upon the amount of the taxpayer's compensation received from the state. The exaction was not, as here, of a proportion of each dollar paid by the government. It was upon net income remaining after allowable deductions from gross.

The decision in *Fidelity & Deposit Co.* v. *Pennsylvania,* 240 U. S. 319, relied on as sustaining the instant exaction, neither rules nor aids in the decision of the present cause. There a foreign surety company was required by law to pay an annual fee equal to two per cent. of its gross premiums, in order to be admitted to do business in Pennsylvania. Under a federal statute surety companies desiring to execute bonds running to the United States were required to obtain written authority from the Attorney General so to do. The Fidelity Company obtained such authority and became surety in Pennsylvania on a number of bonds insuring the faithful performance of official duties by federal employes. It challenged so much of the state tax as was laid upon the premiums received for writing these bonds. The challenge was not sustained. The claim that the company, by obtaining leave to execute bonds running to the United States, had become a federal instrumentality, was properly overruled.[34] But it is said that, in sustaining the tax, the court held that an exaction on the gross receipts of government contracts is valid. A moment's reflection will show that this is incorrect. The premiums received by the surety company were received from its clients—those for whom it wrote the bonds. It received no compensation from the United States and its transactions in essence were with

---

[34] See the cases cited in note 10, *supra.*

citizens of the State of Pennsylvania as such. They did not differ from transactions with federal officers and employes whereby the latter procured any other sort of goods or service.[35]   Of course, the mere fact that a contractual relation—that of suretyship—was created between the Fidelity Company and the United States, was not in and of itself sufficient to relieve the company of the burden of paying a local tax for the privilege of doing business with its customers.

*Alward* v. *Johnson*, 282 U. S. 509, is cited as an instance where a gross receipts tax incident upon the consideration paid the contractor by the United States was sustained.   Examination of the case demonstrates that the contrary is true.   Alward was engaged in operating an automotive stage line between points in California. In his business he employed automotive property and used the state highways.   In classifying property for taxation the state separately classified property of persons carrying on such a business as his and laid a tax on this class of property, in lieu of all other taxes, at the rate of four and one-half per cent. of gross receipts. Other classes of property were taxed at a percentage of value.   As the major portion of Alward's gross receipts arose from a contract for carrying United States mails he insisted that the tax was invalid because, by virtue of his contract with the Government, he became a federal agency immune from taxation upon his gross receipts.

This court found that the Supreme Court of California had declared the tax one upon property in cases having no relation to its incidence upon federal instrumentalities or means.   It further found that the challenged classification for taxation of automotive property used in a business transacted on the public roads was not arbitrary or unreasonable.   The case was likened to those arising

---

[35] See note 5, *supra*.

under the commerce clause in which the intrastate property of an interstate carrier was either directly taxed or was taxed by use of a percentage of gross receipts in lieu of all other taxes, including property taxes, in order to reach a fair measure of the taxable value of the carrier's intrastate property. *Pullman Co.* v. *Richardson,* 261 U. S. 330; *Hopkins* v. *Southern California Tel. Co.,* 275 U. S. 393. It was pointed out that the tax was not on gross receipts as such and did not bear upon the contract between the taxpayer and the government. In the instant case the tax is admittedly an excise for revenue imposed in addition to property taxes and foreign corporation fees paid by the appellee.

It may be considered,—though I do not think with reason,—that the conclusion of the court that the tax was a property tax and not a tax upon gross receipts as such was erroneous but, even if this be conceded, it cannot be contended that the case stands as authority for the proposition that a gross receipts tax as such upon the earnings of a government contractor, from his government contract, is not a burden or impediment upon the operations of the United States within the rule of federal immunity.

Much stress is laid by the Solicitor General upon the decision in *Liggett & Myers Co.* v. *United States,* 299 U. S. 383, and he suggests that the views therein stated be adopted in the present case in preference to those embodied in the *Panhandle Oil* case, *supra.* The suggestion implies, contrary to the fact, that the two decisions are contradictory. The Liggett & Myers Company, a manufacturer of tobacco, sold a portion of its product to a state. The company resisted the collection of a federal internal revenue tax laid "upon all tobacco and snuff manufactured in or imported into the United States, and hereafter sold by the manufacturer or importer, or removed for consumption or sale" at a flat rate in cents

per pound "to be paid by the manufacturer or importer thereof." Upon analysis of the statute it was concluded that the tax was upon the manufacture and that payment was merely postponed until removal or sale. The tax did not vary in amount with the price received for the tobacco and was not in terms upon its sale. Upon this ground the *Indian Motocycle Co.* case and the *Panhandle* case were distinguished.

It may be conceded that often it is difficult to determine whether a tax is laid upon the local operations of a manufacturer or contractor or upon the actual sale of his product. But such distinctions must be made. Indeed the court itself is required to make such an one in the instant case in determining that payment for what the appellee manufactured for the government in Pittsburgh, Pennsylvania, did not constitute a gross receipt in West Virginia under the contract. The court has repeatedly been confronted with the problem whether a tax was in fact on the sale of a commodity or upon some prior dealing with it by the producer or supplier. While the distinctions drawn may seem somewhat nice, examination of the facts carries conviction that the distinctions are substantial.[36]

It is suggested that the appellee's status as an independent contractor lifts the ban from the tax. This is to ignore the direct bearing of the exaction on the transaction between the contractor and the government. The fact that the tax is laid upon him who contracts with the government rather than upon the contract as such, or the government itself, is immaterial. Every purchaser of government obligations is an independent con-

---

[36] *Cornell* v. *Coyne*, 192 U. S. 418; *Hope Natural Gas Co.* v. *Hall*, 274 U. S. 284; *Wheeler Lumber Co.* v. *United States*, 281 U. S. 572. The same problem arises in connection with taxation alleged to burden interstate commerce. See *American Manufacturing Co.* v. *St. Louis*, 250 U. S. 459.

tractor with the government. If the fact that the tax-payer is an independent contractor were significant, it would have validated every tax laid upon the ownership of government obligations or upon the interest received therefrom.[37] It has been held that ores produced by an independent contractor for the government, though still in his possession, cannot be taxed by a state;[38] and that a license tax upon an independent contractor cannot be measured by the gross receipts from his transactions with the government.[39]

What was said by Mr. Justice Bradley, dissenting in *Railroad Company* v. *Peniston,* 18 Wall. 5, 38, when read in the light of its context, has no bearing upon the issue here presented. In *M'Culloch* v. *Maryland,* in holding that a tax upon the operations of the United States Bank invaded the federal immunity, Chief Justice Marshall said:

"It [the immunity] does not extend to a tax paid by the real property of the bank, in common with the other real property within the State, . . ."

In the *Peniston* case the question was whether a uniform *ad valorem* state tax could lawfully be assessed upon the intrastate property of the railroad, a federal corporation. The court held that it could. The correctness of the decision has never been doubted. Justices Bradley and Field, however, thought that the scope of the immunity was so broad as to exempt even the local property of a federal instrumentality from such a uniform local tax. It is to be observed that no other kind of exaction was involved. Mr. Justice Bradley insisted that while

[37] See the cases cited in notes 17, 18 and 19.

[38] *Jaybird Mining Co.* v. *Weir,* 271 U. S. 609.

[39] *Western Union Tel. Co.* v. *Texas,* 105 U. S. 460; *Williams* v. *Talladega,* 226 U. S. 404; *Indian Motocycle Co.* v. *United States,* 283 U. S. 570; *Panhandle Oil Co.* v. *Mississippi ex rel. Knox,* 277 U. S. 218; *Graves* v. *Texas Company,* 298 U. S. 393.

such a tax might lawfully be laid upon the *property* of one who was a mere contractor with the United States it could not be laid upon the local assets of a federal corporate instrumentality. The challenged tax was not upon the franchise of the corporation granted by the government, not on its right to exist within the state, nor upon the gross receipts from its operations. Confessedly the property of a contractor with the government is more remote from the government's operations than is the property of a government instrumentality. If the latter may be locally taxed *a fortiori* the former may, and the language of Mr. Justice Bradley applied only to that situation, and not to a gross receipts tax such as we have here.

Does the fact that the tax is non-discriminatory save it? The Solicitor General, as we have seen, so argues. He says that both the appellee and the United States derive substantial benefits in connection with the federal projects located in the State and adds that it seems these benefits should not be free. Though he does not overlook the fact that when the work is completed the United States will continue to receive benefits from the State, he contends that a non-discriminatory tax upon the gross receipts of the contractor is but a method of reimbursing the State for benefits conferred. The argument proves too much. It requires that equal and uniform state taxation upon federal property on which stand customs houses, post offices, forts, arsenals, *et id omne genus,* be upheld. In every instance of the ownership and use of property within a state, according to the argument, the federal government receives substantial benefits for which it should pay. The Solicitor General balks at the result of his position. He says: "We recognize that the logic of our analysis of benefits received would lead to taxation of the sovereign itself. But the attributes of sovereignty may be such as to prevent a tax from being

imposed upon the government itself. Certainly, the principle of the tax immunity of the sovereign itself is too firmly established now to be reexamined."

The short answer is that the immunity from state taxation upon the means, the operations, and the instruments of the government is just as firmly established as is the immunity from taxation of the government's property or offices or posts created by it, and that neither class of taxation can be justified by the fact that the burden on the government is uniform with that laid on others.

Taxes condemned by the court's decisions which were imposed upon the principal and interest of federal securities, upon the product of mining lessees, in which the government had an interest, upon storage and sale of property sold to the government, upon the operation and franchises of federal instrumentalities, such as national banks, were non-discriminatory. They bore equally and alike upon property and operations in which the government was interested and those which were alien to it, but they were voided as illegally burdening the operations of the United States. The fact that taxes upon government property and upon property of wholly owned government corporations were non-discriminatory did not suffice to save them. Taxes on franchises granted by the federal government, taxes upon the office or salary of a federal official, though non-discriminatory, nevertheless fell under the ban. It was said in *Johnson* v. *Maryland,* 254 U. S. 51, 55:

"Here the question is whether the State can interrupt the acts of the general government itself. With regard to taxation, no matter how reasonable, or how universal and undiscriminating, the State's inability to interfere has been regarded as established since McCulloch *v.* Maryland, 4 Wheat. 316."

The element of discrimination becomes important only in a case where a tax which would otherwise be per-

missible is aimed at the taxpayer because of his relation to the government. Of course a state cannot lay a heavier burden upon those contracting with the government simply because they are such contractors. A discrimination of that nature on its face spells a hostile purpose, an intent to hinder and burden the government, to impede its operations, and to discourage dealing with it. But the question of discrimination has no place in the consideration of the legality of an exaction laid directly upon the government, upon its operations, or upon the means or instrumentalities it has chosen for executing its powers.

As we have seen, the Solicitor General suggests that the tax should be sustained, although it lays a burden on the United States, because the burden is a "normal tax burden" and the United States can bear it. The opinion of the court suggests the same thought and adds that if West Virginia ever imposes a gross receipts tax uniform in its incidence, but inordinately heavy, Congress has power to relieve the government from such interference. Both suggestions are in the teeth of all that has been said by the court on the subject of federal immunity. The necessity for enforcement of the doctrine was embodied in the phrase of Chief Justice Marshall in *M'Culloch* v. *Maryland, supra,* that "the power to tax involves the power to destroy." As was said in *Knowlton* v. *Moore,* 178 U. S. 41, 60:

"This principle is pertinent only when there is no power to tax a particular subject, and has no relation to a case where such right exists. In other words, the power to destroy which may be the consequence of taxation is a reason why the right to tax should be confined to subjects which may be lawfully embraced therein, even although it happens that in some particular instance no great harm may be caused by the exercise of the taxing authority as to a subject which is beyond its scope."

Chief Justice Marshall denied the existence of the power. From that day to this the court has consistently held that the question is not one of quantum, not one of the weight of the burden, but one of power. The court has said that the attempt to tax the means employed by the Government is "the usurpation of a power which the people of a single State cannot give." Referring to the decision in *M'Culloch* v. *Maryland,* it was said:

"The decision in that case was not put upon any consideration of degree but upon the entire absence of power on the part of the States to touch, in that way at least, the instrumentalities of the United States; 4 Wheat. 429, 430; and that is the law today." [40]

Again the court has said:

"It is obvious, that the same power which imposes a light duty, can impose a very heavy one, one which amounts to a prohibition. Questions of power do not depend on the degree to which it may be exercised. If it may be exercised at all, it must be exercised at the will of those in whose hands it is placed. If the tax may be levied in this form by a State, it may be levied to an extent which will defeat the revenue by impost, so far as it is drawn from importations into the particular State." [41]

Again it was recently said:

"Where the principle applies it is not affected by the amount of the particular tax or the extent of the resulting interference, but is absolute. *McCulloch* v. *Maryland,* 4 Wheat. 316, 430; *United States* v. *Baltimore & Ohio R. Co.,* 17 Wall. 322, 327; *Johnson* v. *Maryland,* 254 U. S. 51, 55–56; *Gillespie* v. *Oklahoma,* 257 U. S. 501, 505; *Crandall* v. *Nevada,* 6 Wall. 35, 44–46." [42]

No one denies the competence of the Congress to waive the immunity in whole or in part. [43] But this is the

---

[40] *Johnson* v. *Maryland,* 254 U. S. 51, 55.

[41] *Brown* v. *Maryland,* 12 Wheat. 419, 439.

[42] *Indian Motocycle Co.* v. *United States,* 283 U. S. 570, 575.

[43] *Van Allen* v. *Assessors,* 3 Wall. 573.

reverse of saying the power to tax federal means and operations exists in the states subject to veto by Congress of any exorbitant exercise of the power. And it may be pertinent to suggest that, if, as the court has always held, the immunity is reciprocal, the state legislatures, by a parity of reasoning, ought to have the power to prohibit federal taxes upon state operations, if they be deemed immoderate.

It must be evident that if the principle of federal immunity is to be preserved, if all that the court has said respecting it is not to be set aside, the gross receipts tax under review cannot be rescued from condemnation by the circumstances that it bears upon an independent contractor, does not discriminate, and is not so burdensome as seriously to interfere with governmental functions.

Such a tax upon gross receipts has been contrasted in all the decisions, including those dealing with burdens upon commerce, with a tax upon net income; the one being held a forbidden burden and the other a permissible exaction. Despite the fact that the court has repeatedly applied the same tests of validity to taxes alleged to burden interstate commerce as it has to exactions said to burden the operations of the federal government,[44] it is said in the opinion:

"Respondent invokes our decisions in the field of interstate commerce, where a tax upon the gross income of the

---

[44] *Telegraph Co.* v. *Texas,* 105 U. S. 460, 465; *Western Union Telegraph Co.* v. *Taggart,* 163 U. S. 1, 14; *Western Union Telegraph Co.* v. *Kansas,* 216 U. S. 1, 32; *U. S. Express Co.* v. *Minnesota,* 223 U. S. 335, 344; *Choctaw, O. & G. R. Co.* v. *Harrison,* 235 U. S. 292, 299; *Kansas City, F. S. & M. Ry. Co.* v. *Botkin,* 240 U. S. 227, 232; *Gillespie* v. *Oklahoma,* 257 U. S. 501, 504–5; *Northwestern Mutual Life Ins. Co.* v. *Wisconsin,* 275 U. S. 136, 140; *Macallen Co.* v. *Massachusetts,* 279 U. S. 620, 627; *Indian Motocycle Co.* v. *United States,* 283 U. S. 570, 575; *Eastern Air Transport* v. *South Carolina Tax Comm'n,* 285 U. S. 147, 152; *Fox Film Corp.* v. *Doyal,* 286 U. S. 123, 126; *Liggett & Myers Tobacco Co.* v. *United States,* 299 U. S. 383, 387.

taxpayer derived from interstate commerce has long been held to be an unconstitutional burden. . . .

"But the difference is plain. Persons have a constitutional right to engage in interstate commerce free from burdens imposed by a state tax upon the business which constitutes such commerce or the privilege of engaging in it or the receipts as such derived from it."

As has been pointed out, the doctrine of federal immunity from state taxation is based upon the right of the federal government to carry on its lawful operations free from burden or impediment imposed by a state upon the business which constitute such operations or the privilege of engaging in them. The Constitution contains no clause forbidding the states to burden, impede, or interfere with the operations of the federal government. In express terms it confers upon that government power to conduct those operations. Nor does the Constitution contain any clause prohibiting the states from burdening or interfering with the conduct of interstate commerce. In express terms it confers upon Congress the power to regulate that commerce. In each case there is implied from the federal power delegated by the people an immunity from interference or burden by the states. The cases are entirely analogous. Comparing the immunity of interstate commerce from state taxation with the like immunity of the federal government, the court has said:

"The rule as to instrumentalities of the United States on the other hand is absolute in form and at least stricter in substance." [45]

The cases in our reports respecting the immunity of interstate commerce from burden by state taxation are the complete analogue of those dealing with the federal immunity from the like burden. As in the case of a private corporation employed as an agency of the United

---

[45] *Gillespie* v. *Oklahoma*, 257 U. S. 501, 505.

States, so in the case of a private corporation engaged in interstate commerce, the states are free to lay a uniform and nondiscriminatory tax upon the property employed in the business within their jurisdiction.[46]

A tax upon the gross receipts of corporations derived both from intrastate and interstate commerce is bad because it burdens the latter.[47] A franchise tax upon a corporation transacting an interstate business, measured by its interstate business or its property without the state, is void, on the same principle that a tax laid upon the franchise of a corporation which is a federal agency or instrumentality is void.[48]

A sales tax on gasoline sold within a state is invalid as it affects gasoline purchased outside the state for use therein, for the same reason a sales tax upon sales to the United States is invalid.[49] A tax upon the gross receipts of one engaged in interstate commerce is bad be-

---

[46] *Pullman's Palace Car Co.* v. *Pennsylvania,* 141 U. S. 18; *Western Union Tel. Co.* v. *Taggart,* 163 U. S. 1; *Old Dominion S. S. Co.* v. *Virginia,* 198 U. S. 299; *United States Express Co.* v. *Minnesota,* 223 U. S. 335; *Pullman Co.* v. *Richardson,* 261 U. S. 330. And as in the case of agents of the federal government or contractors with it, a state may measure the value of the property within its borders by a receipts tax in lieu of all property taxes. Compare *United States Express Co.* v. *Minnesota,* 223 U. S. 335; *Cudahy Packing Co.* v. *Minnesota,* 246 U. S. 450; *Pullman Co.* v. *Richardson,* 261 U. S. 330, with *Alward* v. *Johnson,* 282 U. S. 509.

[47] *Philadelphia & Southern S. S. Co.* v. *Pennsylvania,* 122 U. S. 326; *Galveston, H. & S. A. Ry. Co.* v. *Texas,* 210 U. S. 217; *Meyer* v. *Wells, Fargo & Co.,* 223 U. S. 298.

[48] Compare *Western Union Tel. Co.* v. *Kansas,* 216 U. S. 1, and *Ozark Pipe Line Corp.* v. *Monier,* 266 U. S. 555, with *California* v. *Central Pacific R. Co.,* 127 U. S. 1; *Owensboro National Bank* v. *Owensboro,* 173 U. S. 664; *Third National Bank* v. *Stone,* 174 U. S. 432; and *Louisville* v. *Third National Bank,* 174 U. S. 435.

[49] Compare *Cook* v. *Pennsylvania,* 97 U. S. 566, and *Bowman* v. *Continental Oil Co.,* 256 U. S. 642, with *Panhandle Oil Co.* v. *Mississippi ex rel. Knox,* 277 U. S. 218.

cause a direct burden on that commerce in the same sense that a tax on the gross receipts of business done with the United States is a direct burden on the transaction with the federal government.[50]  In contrast, a tax on the net income of one engaged in interstate commerce is not upon his transactions in that commerce, but so remote therefrom as not to burden it, just as a net income tax upon one who contracts with the federal government is inoffensive to the rule of federal immunity.[51]

A state may not lay an occupation tax upon the act of engaging in interstate commerce, for the same reason that it may not lay a similar tax upon the employment of an officer of the United States.[52]  The same considerations of remoteness sustain taxes upon the mere purchase of articles intended for use in interstate commerce or for the fulfilment of government contracts.[53]

I conclude, then, that the tax in question is plainly imposed upon the operations of the federal government; that it falls squarely within the definition of such a burden and is prohibited upon the principle announced

---

[50] Compare *Cook* v. *Pennsylvania,* 97 U. S. 566, *Fargo* v. *Michigan,* 121 U. S. 230, *Crew Levick Co.* v. *Pennsylvania,* 245 U. S. 292, *New Jersey Bell Tel. Co.* v. *State Board,* 280 U. S. 338, *Fisher's Blend Station* v. *State Tax Comm'n,* 297 U. S. 650, *Puget Sound Co.* v. *Tax Comm'n, ante,* p. 90, with *Western Union Tel. Co.* v. *Texas,* 105 U. S. 460.

[51] Compare *Shaffer* v. *Carter,* 252 U. S. 37, *United States Glue Co.* v. *Oak Creek,* 247 U. S. 321, and *Atlantic Coast Line* v. *Daughton,* 262 U. S. 413, with *General Construction Co.* v. *Fisher,* 295 U. S. 715 (149 Ore. 84; 39 P. (2d) 358), and *Burnet* v. *A. T. Jergins Trust,* 288 U. S. 508.  But see *Gillespie* v. *Oklahoma,* 257 U. S. 501, and *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393.

[52] Compare *East Ohio Gas Co.* v. *Tax Commission,* 283 U. S. 465, with *Dobbins* v. *Commissioners,* 16 Pet. 435, and *New York ex rel. Rogers* v. *Graves,* 299 U. S. 401.

[53] Compare *Eastern Air Transport* v. *South Carolina Tax Comm'n,* 285 U. S. 147, with *Trinityfarm Construction Co.* v. *Grosjean,* 291 U. S. 466, and *Tirrell* v. *Johnston,* 293 U. S. 533.

in *M'Culloch* v. *Maryland* and ever since consistently applied in the decisions of the court. I think that the judgment should be affirmed.

These views with respect to the nature of the tax render it unnecessary to express any opinion as to the asserted exclusive federal jurisdiction over the area within which the appellee pursued the activities which are the subject of the exaction.

MR. JUSTICE MCREYNOLDS, MR. JUSTICE SUTHERLAND and MR. JUSTICE BUTLER join in this opinion.