

# Office of the Attorney General
## State of Texas

DAN MORALES
ATTORNEY GENERAL

July 21, 1993

Honorable Gonzalo Barrientos
Chairman
Committee on Nominations
Texas State Senate
P.O. Box 12068
Austin, Texas 78711

Opinion No. DM-237

Re: Validity of a state licensing fee assessed on certified public accountants who are employed by the federal government (RQ-485)

Dear Senator Barrientos:

You have asked this office to consider whether certified public accountants employed by the federal government may validly be subjected to the $200 fee increase mandated by House Bill 11 of the First Called Session, of the 72d Legislature.

Article 10, section 10.06 of House Bill 11 amends the Public Accountancy Act of 1991. It adds section 9A to read as follows:

> (b) In addition to the fee imposed under Subsection (a) of this section, an additional biennial fee of $200 is imposed. . . A licensee who does not pay the additional biennial fee and all late fees before *the first anniversary of the due date of the additional biennial fee may* only receive a renewal license by submitting an application, all accrued fees, and the direct administrative costs incurred by the board in using the renewal license. The board shall by rule provide the information that must be contained in the application. *The board shall have no authority to waive the collection of any fee or penalty.*

Acts 1991, 72d Leg., 1st C.S., ch. 5. § 10.06, at 180 (emphasis added).

You ask whether this fee may properly be levied upon certified public accountants who work exclusively for the federal government. You note that differing views have been expressed on this question. It has been suggested, on the one hand, that certified public accountants who provide services solely to the federal government are exempt from this fee. On the other hand, it has been argued that the additional $200 licensing fee imposed by § 9A(b) of the Public Accountancy Act of 1991 is not unconstitutional by virtue of its applicability to federal employees. After consideration of the relevant case law and statutory provisions, we agree with the latter conclusion.

The argument that a state cannot impose a licensing fee on an employee of the federal government rests upon an antiquated understanding of the doctrine of intergovernmental tax immunity, a doctrine whose origins are to be found in *McCulloch v.*

*Maryland*, 4 Wheat. 316 (1819). In *McCulloch*, Chief Justice Marshall overturned a tax levied directly by the State of Maryland on the Bank of the United States. The basis for the decision was the Supremacy Clause of the United States Constitution. As Justice White summarized the *McCulloch* argument in *United States v. County of Fresno*, 429 U.S. 452 (1977):

> An Act of Congress had created the bank in order to carry out functions of the National Government enumerated in the United States Constitution. The Court noted that the power to tax the bank "by the States may be exercised so as to destroy it," 4 Wheat, at 427, 4 L. Ed. 579, and consequently that the power to tax, if admitted, could be exercised so as effectively to repeal the Act of Congress which created the Bank.

*Fresno*, 429 U.S. at 458.

*McCulloch* establishes clearly the proposition that states may not impose a tax directly on the federal government, and more generally may not impose "taxes the legal incidence of which falls on the Federal government." *Id.* at 459. *McCulloch* was at one time more broadly read to forbid taxation on those who contracted with the federal government, its agents or instrumentalities, if such taxation might increase the cost of doing business for the federal government. *See, e.g., Dobbins v. Comm'rs of Erie County*, 16 Pet. 435, 10 L. Ed. 1022 (1842) (state tax on income of federal employee unconstitutional); *Panhandle Oil Co. v. Mississippi ex rel. Knox*, 277 U.S. 218 (1928) (sales tax imposed on one who sold to federal government unconstitutional). Under such an expansive reading of *McCulloch*, it might well be the case that an occupation tax of the sort imposed by the 1991 amendment to the Public Accountancy Act would be unconstitutional as applied to a federal employee.

However, the modern trend in intergovernmental tax immunity law, which began with the Stone Court and has continued to the present day, is to find far fewer kinds of transactions immune on constitutional grounds from taxation. In *James v. Dravo Contracting Co.*, 302 U.S. 134 (1937), a Pennsylvania corporation which had a federal contract for locks and dams on the Kanawha and Ohio rivers brought suit to enjoin collection of a West Virginia state gross receipts tax on the contract. The court, by a five-to-four vote, rejected the corporation's argument:

> We hold that the West Virginia tax so far as it is laid upon the gross receipts of respondent derived from its activities within the borders of the state does not interfere in any substantial way with the performance of federal functions, and is a valid exaction.

*James*, 302 U.S. at 161.

Justice Roberts, in dissent, averred that the decision "overrule[d], *sub silentio*, a century of precedents." 302 U.S. at 161. This claim has proven to be accurate. In 1939, in *Graves v. New York ex rel. O'Keefe*, 306 U. S. 466, the court explicitly overruled

*Dobbins* and its progeny.  It rejected the view "that a tax on income is legally or economically a tax on its source," 306 U.S. at 480, and noted that

> the only possible basis for implying a constitutional immunity from state income tax of the salary of an employee of the national government or of a governmental agency is that the economic burden of the tax is in some way passed on so as to impose a burden on the national government tantamount to an interference by one government with the other in the performance of its functions.

*Graves*, 306 U.S. at 481-2.

The court made it clear that the potential incidental burden of such an income tax was not such an interference:

> So much of the burden of a non-discriminatory general tax upon the incomes of employees of a government, state or national, as may be passed on economically to that government, through the effect of the tax on the price level of labor or materials, is but the normal incident of the organization within the same territory of two governments, each possessing the taxing power.  The burden, so far as it can be said to exist or to affect the government in any indirect or incidental way, is one which the Constitution presupposes, and hence it cannot rightly be deemed to be within an implied restriction upon the taxing power of the national and state governments which the Constitution has expressly granted to one and has confirmed to the other.  The immunity is not one to be implied from the Constitution, because if allowed it would impose to an inadmissible extent a restriction on the taxing power which the Constitution has reserved to the State governments.

*Id.* at 487.

The result of such cases as *James* and *Graves*, as well as such later decisions as, e.g., *City of Detroit v. Murray Corp.*, 355 U.S. 489 (1958); *United States v. City of Detroit*, 355 U.S. 466 (1958); *United States v. Township of Muskegon*, 355 U.S. 484 (1958); *United States v. County of Fresno*, 429 U.S. 452 (1977); *United States v. New Mexico*, 455 U.S. 720 (1982); and *South Carolina v. Baker*, 485 U.S. 505 (1988) is both to simplify and to narrow the doctrine of intergovernmental tax immunity.

The most succinct statement of modern tax immunity doctrine with respect to federal employees or contractors is provided by the court in *Fresno*:

> The rule to be derived from the Court's more recent decisions, then, is that the economic burden on a federal function of a state tax imposed on those who deal with the Federal Government does not

render the tax unconstitutional so long as the tax is imposed equally
on the other similarly situated constituents of the State.

429 U.S. at 463-4.

Under a *Fresno* analysis, two questions must be asked about a state tax that is levelled on a federal employee. First, does the legal, as distinct from the economic, impact of the levy fall upon the United States? Second, does the tax discriminate between federal and state employees to the detriment of the federal employees?

The legal impact of the additional fees levied by House Bill 11 falls upon certified public accountants, and not upon their employers. The fee is levied directly on the accountants. Accordingly, the sole remaining question is whether this fee impermissibly discriminates against federal employees.

We should first note that a blanket exemption solely of state-employed accountants would, in all probability, be such an impermissible discrimination. In *Davis v. Michigan Dep't of the Treasury*, 489 U.S. 803 (1989), the United States Supreme Court held that the State of Michigan could not exempt from taxation the retirement benefits of state employees, when the benefits of federal employees were subject to the tax. The decision was based on the Public Salary Tax Act of 1939, 4 U.S.C. § 111, which the court viewed as "codif[ying] the result in *Graves* and foreclos[ing] the possibility that subsequent judicial reconsideration of that case might reestablish the broader interpretation of the immunity doctrine." *Davis*, 489 U.S. at 812. The court read the act as "coextensive with the prohibition against discriminatory taxes embodied in the modern constitutional doctrine of intergovernmental tax immunity." *Id.* at 813.

In *Davis*, the court found that the state's exemption of its retired employees from a general tax imposed, *inter alia*, on retired federal employees, violated the anti-discrimination principle of the Public Salary Tax Act of 1939 and of intergovernmental tax immunity doctrine. However, the Public Accountancy Act does not discriminate in this fashion.

By its terms, the additional fee assessed by article 10, section 10.06 of House Bill 11 is of general application. The fee is assessed on all certified public accountants licensed to practice in Texas. The legislation is, therefore, plainly constitutional on its face.

You express some concern, however, as to whether the statute is being constitutionally applied. It is your understanding that "CPA's working for state agencies are not required to pay this fee to the Board of Public Accountancy. It is simply 'understood' that their fees have been paid by their respective agencies although no money actually exchanges hands." On the other hand, it has been suggested to us that accountants employed by state agencies first pay the fees, and are then upon application reimbursed by their employers.

While the question of how the statute is being applied may be of constitutional moment in this regard, this office does not ordinarily make factual determinations of the sort that would be necessary here in the opinions process. Accordingly, we cannot speak to this particular question. We therefore conclude only that the $200 fee required of accountants by the Public Accountancy Act of 1991 is not facially unconstitutional.

Accordingly, since the legal incidence of the $200 fee increase in certified public accountants' fees falls on the accountants, and since federal and state accountants are similarly treated with respect to the fee, we find that neither the Public Salary Tax Act nor the doctrine of intergovernmental tax immunity require federally-employed accountants to be exempted from paying the fee.

## S U M M A R Y

The $200 fee increase mandated by the Public Accountancy Act of 1991 is not facially unconstitutional.

Very truly yours,

DAN MORALES
Attorney General of Texas

WILL PRYOR
First Assistant Attorney General

MARY KELLER
Deputy Attorney General for Litigation

RENEA HICKS
State Solicitor

MADELEINE B. JOHNSON
Chair, Opinion Committee

Prepared by James Tourtelott
Assistant Attorney General